ALLSTATE INSURANCE COMPANY, a corporation and Delta Overseas, Inc., a corporation, Plaintiffs-Appellees,

v.

IMPARCA LINES, a foreign corporation, Defendant-Appellant.

No. 79-3355.

United States Court of Appeals, Fifth Circuit. Unit B

May 26, 1981. Rehearing Denied June 24, 1981.

Smathers & Thompson, Christian D. Keedy, Miami, Fla., for defendant-appellant.

Richard R. McCormack, Miami, Fla., for plaintiffs-appellees.

Before JONES, HILL and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, Circuit Judge:

Appellant, Imparca Lines ("Imparca"), appeals from the judgment of the district court holding it liable to the appellee for the value of the contents of a container which was lost or stolen before final delivery to the consignee. We reverse.

## FACTS

In July, 1977, Delta Overseas, Inc. ("Delta" or "shipper"), a company engaged in the business of importing and exporting electronic equipment, received an order for equipment from Shiba Electronic S. A. ("Shiba"), a Venezuelan company. On July 13, 1977, Delta obtained a 20-foot cargo container from Imparca. Delta's employees loaded the container, sealed it, and had its own agent deliver the container to Imparca. On or about July 30, 1977, the container was placed aboard the M/V Santa Teresa, a vessel chartered by Imparca. Imparca issued a clean bill of lading which described

the container and stated that the container contained 279 cartons of "electronic equipment, radio apparatus." The bill of lading also provided that the carrier's responsibilities were discharged upon delivery of the goods into the custody of government authorities as required by law of a foreign port.[1]

On August 4, 1977, the Santa Teresa arrived at Puerto Cabello, Venezuela, where it was to unload its cargo; however, due to crowded conditions, the unloading took place between August 29 and September 12. Under Venezuelan law, an organization known as the Instituto Nacional De Puertos or the National Institute of Ports ("INP") is responsible for all operations of a seaport including stevedoring, warehousing and receiving and delivering cargo.

Although the INP handled the unloading of the vessel, Imparca's agent in Puerto Cabello employed a checker to check the unloading of the cargo against a tally book. The notations in the tally book indicate that the container in question was unloaded from the Santa Teresa in good condition and placed alongside on the dock. The district court found that:

> In Puerto Cabello, at sometime between August 29 and September 12, 1977, [the container] was unloaded from the Santa Teresa by employees of the National Institute of Ports.

In October, 1977, when it came to light that the container was missing, a search was commissioned to locate the container. It has never been found. On December 27, 1977, the INP issued the Acta de Confrontacion or Certificate of Verification ("Acta"). The Acta contained this notation (translated into English):

Container ICSU–289665 was checked by the cargo supervisor: Felipe Narvaez C.I. [I.D.] 4.839.147 (Official of I.N.P.) who was working in the hatchway of said vessel at the time and who at the moment of preparing the tonnage statement for payment of the workers recorded the mentioned container as having been unloaded: which was not delivered by the steamship company representative to any official of the I.N.P.—because it was not found.

Plaintiff's exhibit 20. The district court relied upon this seemingly inconsistent notation for its finding that the container:

> [T]ogether with the 279 cartons contained in it, have never been delivered by Imparca Lines to either the Institute of National Ports (INP), Venezuelan Customs, or the named consignee, Shiba. Sometime after leaving Miami, the container was lost or stolen. In any event, it disappeared.

The court further found:

> The testimony and official records of the Venezuelan government as well as business records of Imparca's agent in Puerto Cabello (Gerencia Maritima) failed to establish that the container involved here was discharged from the M/V Santa Teresa in Puerto Cabello, although it is undisputed that it was never delivered to Venezuelan Customs at Barquisimeto.

The district court held that appellee, Allstate Insurance Co., as subrogee to Delta's rights, was entitled to recover from Imparca $68,077.43 representing the invoice price of the missing goods plus freight charges.

---

1. The relevant portions of the bill of lading provide:

 Clause 5. The Carrier, Master and ship shall have liberty comply with any orders or directions as to loading, departure, arrival . . . discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof. . . . Delivery or other disposition of the goods in accordance with such orders or directions shall be fulfillment of the contract voyage. . . .
 In addition to all other liberties herein the Carrier shall have the right to . . . deposit or discharge the goods at anyplace whatsoever, surrender or dispose of the goods in accordance with any direction, condition or agreement imposed upon or exacted from the Carrier by any government or department thereof. . . .
 Clause 12. . . . The responsibility of the Carrier in any capacity shall altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities. . . .
 Plaintiff's exhibit 1.

## DECISION OF THE DISTRICT COURT

We review the findings of fact of the district court under the clearly erroneous standard of review. Fed.R.Civ.P. 52(a). We are immediately struck by the apparent inconsistencies in the findings with respect to the arrival of the container in Puerto Cabello. The court first concluded that the container was aboard the ship when it arrived, was unloaded and was placed on the dock. Both the tally book and the Acta support this finding of fact. But the court then found that the container was never "delivered" to the INP and that the evidence failed to show that the container was discharged from the vessel. This latter finding is apparently based upon that portion of the notation on the Acta that the container "was not delivered by the steamship company representative to any official of the INP—because it was not found." In order to reconcile the district court's findings, we must conclude that when the court said that the container was not delivered, it meant something other than merely discharging the container from the ship and placing it on the dock; we interpret the district court's finding that the container was not "delivered" to be a legal conclusion as to what constitutes "delivery." We conclude that the district court's finding of fact that the container was unloaded from the vessel and placed on the dock is supported by the evidence.[2] We conclude that the district court erred in its legal conclusion that the container was not "delivered."

## LEGAL DEFINITION OF DELIVERY AND DELIVERY IN THIS CASE

■ Since it appears that the container was discharged from the vessel, the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300, et seq., does not govern the relationship between the parties after the discharge. From the point of discharge until proper delivery of the cargo, the terms of the Harter Act, 46 U.S.C.A. §§ 190–196 (1958), control. *F.J. Walker, Ltd. v. Motor Vessel "Lemoncore"*, 561 F.2d 1138, 1143 (5th Cir. 1977). Section 1 of the Harter Act, 46 U.S.C.A. § 190, forbids the inclusion of any term in a bill of lading which would lessen or avoid the carrier's obligation, *inter alia*, to make a "proper delivery" of the cargo. In this case, the bill of lading provides that the responsibility of the carrier, Imparca, ends and the goods are considered delivered "when taken into the custody of Customs or other authorities" of a foreign port. The evidence shows that the INP is an "authority" as contemplated in the bill of lading, and that the INP took custody of the container when they unloaded it and placed it on the dock. At that point, INP assumed their normal responsibilities for cargo in Puerto Cabello. Therefore, there was a delivery as defined by the bill of lading; however, this term must pass muster under the Harter Act. The Act does not define "proper delivery." In the most general terms, proper delivery requires discharge of the cargo upon a fit and customary wharf. *F.J. Walker, Ltd. v. Motor Vessel "Lemoncore"*, supra; *Isthmian Steamship Co. v. California Spray-Chemical Corp.*, 300 F.2d 41 (9th Cir. 1962). "To determine whether a 'proper delivery' to a 'fit and customary wharf' has occurred, '[n]o rule is better settled than that delivery must be according to the custom and usage of the port.'" *F.J. Walker, Ltd. v. Motor Vessel "Lemoncore"*, 561 F.2d at 1144, quoting *Constable v. National S.S. Co.*, 154 U.S. 51, 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903 (1894). In *Tan Hi v. United States*, 94 F.Supp. 432 (N.D.Cal.1950), a case cited with approval in our decision in *F.J. Walker, Ltd. v. Motor Vessel "Lemoncore"*, supra, the court stated the rule that "a carrier's delivery to persons charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee is a good delivery on

---

2. If the district court made a finding of fact that the container was not "discharged" from the vessel, we conclude that such finding is clearly erroneous. Wholly aside from the fact that such a finding would be in direct conflict with the court's finding that the container was unloaded, the record evidence overwhelmingly supports the finding that the container was in fact unloaded and placed on the dock, and any finding to the contrary would be clearly erroneous.

the part of the carrier." *Id.* at 435. In *Tan Hi,* the cargo was discharged into the custody of the organization charged by Philippine law with receiving, storing and delivering all cargo under an agreement with the Philippine government. The court held that there had been proper delivery under the laws and customs of the port, and that the carrier's responsibility for the cargo had ended before the cargo disappeared.

 The evidence in this case shows that the INP is an organization of the Venezuelan government which has the sole responsibility of unloading, storing and delivering all cargo destined for Puerto Cabello. In other words, once the unloading of the cargo from the vessel commenced, the carrier had nothing further to do with the cargo. And, indeed, the evidence shows that the carrier was powerless to interfere with the exclusive operation of the port by the INP.

We conclude that the point of delivery as defined by the bill of lading coincides with the point of delivery as defined by the Harter Act and the case law. In this case, the delivery occurred, at the latest, when the cargo was placed on the dock in the custody of INP—the point described in the bill of lading—which coincides with the custom and usage of delivery at that port—the point described by the case law. We conclude the evidence overwhelmingly supports the district court's finding of fact that the container was unloaded from the vessel and placed on the dock in the control of INP. This constitutes delivery as a matter of law, in accordance with the bill of lading and the custom and usage of the port. The district court's legal conclusion that delivery never occurred is thus in error, and is accordingly reversed. Delivery had taken place, and the carrier's responsibility for the goods was discharged before the container disappeared, and accordingly the district court shall on remand enter judgment for Imparca.[3]

REVERSED and REMANDED.

3. Because of our decision that Imparca is not liable, we do not reach the second issue raised by the appellant, that the entire container was

the appropriate package for the purposes of COGSA's $500 limitation of liability.