TAPCO NIGERIA, LTD.,
Plaintiff-Appellant,

v.

M/V WESTWIND, etc., et al.,
Defendants-Appellees.

No. 82–3166.

United States Court of Appeals,
Fifth Circuit.

April 22, 1983.

Deutsch, Kerrigan & Stiles, G. Alex Weller, New Orleans, La., for plaintiff-appellant.

Chaffe, McCall, Toler & Sarpy, Robert B. Deane, Campbell E. Wallace, New Orleans, La., for defendants-appellees.

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

TAPCO NIGERIA, LTD. appeals a judgment of the district court that it was not entitled to recover for shortage in and damage to a consignment of rice loaded aboard the M/V WESTWIND at Mobile, Alabama in December, 1978 and discharged from the vessel in January, 1979 at Lagos, Nigeria.[1] On appeal, TAPCO argues that the carrier did not fulfill its obligations under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 *et seq.,* and the Harter Act, 46 U.S.C. § 190–96. Specifically, it contends that the opening of the vessel's hatches to the Nigerian stevedores did not constitute proper delivery under the Harter Act, and that the carrier did not meet its burden of proof under COGSA to show that dam-

---

1. Suit was originally filed on behalf of TAPCO, which bought the consignment in question prior to its arrival in Lagos. Subsequently, Stomina Establishment, TAPCO's vendor which had purchased the rice from Riceland Foods, was substituted as plaintiff. Stomina reimbursed TAPCO for its loss out of insurance proceeds, and suit was then pursued by Stomina in TAPCO's name.

age to the cargo was the fault of neither the carrier nor its agents.

## I. FACTS

On December 28, 1978, bills of lading were issued by the Westwind Africa Line Ltd., (hereinafter West Africa) owner of the M/V WESTWIND, for a consignment of 29,995 bags of rice purchased by TAPCO from Stomina Establishment, the original consignee. The rice was loaded at Mobile, Alabama on December 28, and the bills of lading certified that the goods were "clean on board." The vessel arrived in Lagos, Nigeria, in January and was directed to dock at the Apapa Berth No. Nine. On January 20, 1979, discharge of the vessel by stevedores hired by the Nigerian Port Authority (NPA) commenced.

The NPA is an agency of the Nigerian government which exercises control over the loading and discharge of cargo in the Port of Lagos. The rules and regulations governing the NPA require that all stevedores employed in the Port of Lagos be hired and paid by the NPA, according to NPA-established rates. No ship is permitted to berth unless the ship's agent produces receipts indicating that all fees have been paid in advance, including the cost of the stevedores hired by the NPA. The NPA appoints the persons to perform the services of pilotage, towing, line handling and stevedoring. The vessel interests have absolutely no control over which stevedores are hired to discharge the vessel. Nor do the vessel interests participate in any way in the discharge.

The NPA-appointed stevedores unloaded the cargo of bagged rice by a system referred to as "direct delivery". In this method of discharge, the cargo is lifted from the holds of the vessel in slings and transported directly to the consignees' trucks located on the wharf alongside the ship. The stevedores load bags of cargo into slings from the hold. The ship's crane is then used to lift the loaded slings out of the hold to the trucks, where the slings are lowered. NPA stevedore personnel operate the crane and cargo gear. Stevedores working on the wharf then unload the rice from the slings and place it on the receiver's trucks.

The district court found that the bagged rice was in good condition when the WESTWIND's holds were first opened at dockside. As the stevedores unloaded the vessel, however, they permitted slings to strike the holds and hatch coamings of the ship, causing bags of rice to break and rice to spill out. Various persons appeared at the WESTWIND's berth and began to pilfer the rice already spilled. As the slings were lowered into the receiver's trucks, loads sometimes struck the truck's sides, causing more bags to break. Persons along the wharf additionally slashed bags which had been loaded onto the trucks, causing rice to spill out from the cracks between the boards which formed the floors of the trucks. The ship's chief officer protested the rough handling and theft of the cargo to both the stevedores and to the NPA, but these protests had no effect. The stevedores did nothing to prevent the pilferage, nor did they attempt a safer handling of the slings. At one point Nigerian policemen appeared with bows and arrows in an attempt to control the situation, but after their departure, the pilferage continued.

Stevedores returned the bags which they had broken to the holds of the ship, and the loose remaining rice was swept up and unloaded into the consignee's trucks. The court found that, upon completion of the unloading activities, the entire consignment had been removed from the ship.

Following a trial to the court, sitting in admiralty without a jury, the district judge concluded: (1) the required surrender by the vessel interests of the cargo to the government-appointed and controlled stevedores while still on board in the holds of the ship constituted proper delivery under the Harter Act, because such delivery was according to the custom and usage of the port, and (2) that any loss or damage to the rice sustained during the discharge was the result of a situation totally beyond the control of West Africa or its agents.

## II. PROPER DELIVERY

TAPCO first argues that the surrender of the cargo to the NPA stevedores in the holds of the vessel violated the requirement of "proper delivery" mandated by the Harter Act. 46 U.S.C. §§ 190–196. West Africa argues that release of the bagged cargo to the Nigerian stevedores was not only proper but required, and so delivery was according to the custom and usage of the port. Thus, the ultimate question presented by this appeal is whether the carrier's release of its cargo into the custody of the NPA stevedores, as required by the law of Nigeria, constitutes the "proper delivery" required of the carrier by the Harter Act.

■ The bills of lading issued by the Westwind Africa Line are governed by both the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 et seq., and by the Harter Act, 46 U.S.C. § 190 et seq. Under COGSA, a carrier of goods in international commerce "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). The Harter Act imposes upon vessels a duty of "proper loading, stowage, custody, care [and] proper delivery" which cannot be avoided by the insertion of exculpatory clauses in the bills of lading. 46 U.S.C. § 190. Although the Harter Act was partially superseded by passage of the Carriage of Goods by Sea Act, COGSA defines the duty of care only from the time the goods are loaded on to the ship until the time when the cargo is released from the ship's tackle at port. 46 U.S.C. § 1301(e). Consequently, the Harter Act is still applicable to any period between the discharge of the cargo from the vessel and its proper delivery. *Allstate Insurance Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir.1981); *F.J. Walker, Ltd. v. M/V LEMONCORE*, 561 F.2d 1138, 1143 (5th Cir.1977); *Pan American World Airways, Inc. v. California Stevedore and Ballast Co.*, 559 F.2d 1173 (9th Cir.1977). TAPCO argues that the WESTWIND officers' release of the rice to the Nigerian stevedores violated its duty of proper delivery, and the terms of the Harter Act control.

■ The Act itself does not define "proper delivery", but only prevents the carrier from agreements which would relieve it from liability for loss arising from negligence, including improper loading or delivery. 42 U.S.C. §§ 190, 191. General maritime law requires that a carrier "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *F.J. Walker, Ltd. v. M/V LEMONCORE, supra*, 561 F.2d at 1142, *quoting American President Lines, Ltd. v. Federal Maritime Board*, 317 F.2d 887, 888 (D.C.Cir.1962). Proper delivery under the Harter Act has been held to require discharge of the cargo "upon a fit and customary wharf." *Allstate Insurance Co. v. Imparca Lines, supra*, 646 F.2d at 168; *F.J. Walker, Ltd. v. M/V LEMONCORE, supra*, 561 F.2d at 1142.

TAPCO maintains that no proper and safe delivery could be effectuated "merely by passively allowing longshoremen to enter the cargo holds of the vessel." They contend that "delivery to a fit wharf" can be accomplished only when the cargo is removed from the ship and "deposited" or "landed" on a dock. *See Isthmian Steamship Co. v. California Spray-Chemical Corp.*, 300 F.2d 41, 43 (9th Cir.1962). TAPCO bases its appeal, therefore, on a literal interpretation of the general common law requirements of proper delivery. In their view, delivery must be made *to a wharf*. The location of the cargo's discharge is critical and controlling.

■ We cannot accept such a literal view. First, the appellant's argument ignores the well-settled rule announced in *Tan-Hi v. United States*, 94 F.Supp. 432, 435 (N.D.Cal.1950) that the common law requirements of proper delivery are modified by the custom, regulations, or law of the port of destination. As explained by that court, the duties to discharge cargo to a fit wharf, to separate each segment, and to protect the cargo until the consignee has a reasonable opportunity to remove it from the wharf, were elements of a proper deliv-

ery "only where the custom, regulations, or law of the port did not otherwise provide.... The common-law did not permit less nor require more in the way of delivery than the usage or the law of the port dictated." *Id.* (citations omitted.) This pronouncement in *Tan Hi* has been universally adopted. As observed by this Court in *Allstate Insurance Co. v. Imparca Lines,* "[t]o determine whether a 'proper delivery' to a 'fit and customary wharf' has occurred, no rule is better settled than that the delivery must be according to the customs and usage of the port," and such delivery will discharge the carrier of his responsibility. 646 F.2d at 168, *quoting Constable v. National Steamship Co.,* 154 U.S. 51, 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903 (1894).

Here, as in *Tan Hi,* the delivery was made to persons actually charged by law with the duty to receive, unload, and deliver the cargo. The Nigerian Port Authority Act created the NPA "[f]or the transfer to the Authority of certain of the Port and Harbor Undertakings of the Government", including "regulating the manner in which and the condition under which the loading and discharging of ships shall be carried out." Nigerian Port Authority Act, Chapter 155, Sections 44(1)b. Pursuant to the Act, the NPA promulgated regulations providing that independent contracting stevedores would be employed by the authority to load and discharge vessels. According to the "NPA Dues and Rates Regulations" (1975), "[t]he charges [for NPA stevedoring labor] relate to the operations on-board a ship and include *all handling from the ship's hold until the cargo is moved over the ship's rail.*" In *Tan Hi* and the instant case, therefore, the government controlling the port had physically intervened in the discharge and delivery process pursuant to local law. It demanded sole control of an operation which otherwise would have been part of the ocean carrier's function of discharge and delivery.

TAPCO attempts to distinguish the decision in *Tan Hi* by arguing that the release of the cargo there to the custody of the Philippines Port Authority warehouse in Manila cannot be compared to the release to the Nigerian stevedores in the hold of the WESTWIND. The former, appellant contends, transferred irrevocable possession, custody and control of the cargo into the port authority's possession, while the release to the Nigerian stevedores at issue here effected no similar exclusive possession because the WESTWIND's officers still retained several means of control over the longshoremen on board the vessel. These means of control, it is argued, ranged from "simple oral orders" and the exercise of "authoritarian presence" over the discharge activity to shutting off the electrical power to the ship's winches. While such practices might have been either feasible or effective under ordinary unloading conditions, certainly they could not have been successful in the port of Lagos in 1979. The record shows that for the past several years Lagos has been subjected to piracy, armed robbery, and flagrant uncontrolled theft of vessels both at berth and at anchor. News articles indicate that in 1980 alone there were an average of twelve attacks a day upon ocean going vessels in Lagos. Indeed, the WESTWIND's Chief Officer testified that he was afraid he would be killed if he had attempted to interfere with the Nigerian stevedores operating the ship's gear. "You don't have nothing (sic) to do with those guys. They are dangerous.... I would be killed if I told them where to store the rice."

TAPCO relies upon *Isthmian Steamship Co. v. California Spray-Chemical Corp.,* 300 F.2d 41 (9th Cir.1962) for its assertion that cargo must at all times be deposited on a wharf. The language in *Isthmian* is that "[i]n order to make a valid delivery, it is necessary to show that the goods in question were *landed on the wharf*". *Id.* at 43, (original emphasis). But this language is not dispositive of the issues in this appeal.

In *Isthmian,* the parties had agreed to a special lighterage clause which provided that the carrier could terminate his obligation of proper delivery by depositing the goods in lighters. Consequently, the clause in question not only provided for lighterage, but also relieved the carrier from liability

for negligence during lighterage. The Ninth Circuit found that the Harter Act did not permit parties to agree to a mode of delivery which would have relieved the carrier of liability. Such an agreement would circumvent the very purpose of the Harter Act to prevent a carrier from inserting a clause under which it was "relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery" of cargo. 46 U.S.C. § 190. The court was explicit in declaring that "[its holding was] only that a carrier cannot relieve itself of liability occurring during such lightering or at any time *before proper delivery*." *Id.* at 47. (Emphasis added).

The question before this Court, however, is to define the elements of proper delivery, not to consider the intent of the Harter Act to forbid carriers from pressuring shippers to accept such exculpatory clauses. Thus, while *Isthmian* may seem to stand for the proposition that goods must always be landed on a dock, it is clear that the decision merely restates the general common law elements of proper delivery enunciated in *Tan Hi*. See *Isthmian*, 300 F.2d at 43 (citing *Tan Hi* and cases therein for the proposition that there exists "a common law [maritime] obligation on the part of the carrier to deposit or 'land' the goods on a wharf.").

We recently considered the elements of "proper delivery" in *Allstate Insurance Co. v. Imparca Lines*, 646 F.2d 166 (5th Cir. 1981). In *Imparca*, cartons of electronic goods were unloaded in good condition and placed on the dock. The unloading was accomplished by the Instituto Nacional de Puertos (INP), an organization solely responsible under Venezuelan law for all the operations of the seaport including stevedoring, warehousing and receiving and de-

livering cargo. One container subsequently disappeared, and was never delivered to the named consignee. We found that proper delivery for purposes of the Harter Act was accomplished when "the container was unloaded from the vessel and placed on the dock in the control of INP." *Id.* at 169.

While it is true that the damage to the cargo in *Imparca* occurred after the cargo had been deposited on the dock, rather than during the unloading, our decision was not predicated upon such a distinction. In fact, our conclusion was based squarely on the fact that *"once the unloading of the cargo from the vessel commenced,* the carrier had nothing further to do with the cargo." *Ibid.* (Emphasis added). After the goods had been turned over to the Venezuelan longshoremen, the carrier was "powerless to interfere with the exclusive operation of the port by the INP." *Ibid.*[2] The container was "delivered" at the point when, as determined by the custom and usage of delivery at that port, it was placed in the custody of the persons charged by law with the unloading of the ship.

We believe it clear, therefore, that the correct focus in ascertaining whether delivery has been accomplished for purposes of the Harter Act is not, as the appellants urge, on the location where the goods are unloaded, but rather on whether delivery was "to *persons* charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee." *Allstate v. Imparca Lines, supra,* 646 F.2d at 168, *quoting Tan Hi, supra,* 94 F.Supp. at 435. (Emphasis added). Here the regulations requiring government-employed stevedores to take charge of the cargo from the ship's holds until finally delivered placed the stevedores in absolute control of the cargo. While it is true that a carrier's duty of safe delivery is strict and nondelegable,

---

2. In *Imparca,* the bill of lading provided that the responsibility of the carrier ended "when taken into the custody of customs or other authorities" of a foreign port. The fact that there was no similar provision here makes no difference. Because the Harter Act forbids the inclusion of any term in a bill of lading which would lessen or avoid the carrier's obligation to

make a proper delivery, this provision could not effect liability *before* delivery had been accomplished. Our decision in *Imparca* is implicit recognition that proper delivery was achieved when the INP took custody of the containers during the unloading process. *Id.* at 168.

the WESTWIND's officers did not "delegate" the discharge to the NPA stevedores. Rather, this operation was usurped from the carrier by Nigerian law. We find that the carrier properly provided safe delivery to the farthest point that it could delivery the goods within the limitations of the law, custom, and usage of the port. We agree with the conclusion of the district court that "(t)he carrier did all that it could reasonably do."

■ Nor is TAPCO benefited by the rule that a delivery according to the usage or law of the port cannot be a proper delivery if cargo is thereby subjected to unusual risks. TAPCO refers to *F.J. Walker, Ltd. v. M/V LEMONCORE, supra,* in which frozen meat was unloaded onto a dock in 90° temperature even when the stevedores knew that a labor dispute would prevent the meat's being placed in proper cold storage. We found that this unloading caused the vessel interests to violate the requirement of proper delivery in spite of a bill of lading provision requiring continuous discharge, because the unloading was made "despite evident harmful consequences to the cargo." *Id.* at 1145. TAPCO contends that Westwind Africa should similarly be held liable for the damage to the rice because it discharged the rice in the face of the obvious danger to the cargo at the hands of the Nigerian stevedores and on the docks at Lagos.

This identical argument was rejected by the court in *Tan Hi.* There, the consignees argued that the carrier should be held responsible for the theft of cargo caused by inadequate supervision by customs agents at the Manila Terminal Company because the vessel's agent was aware that the terminal company would be unable to oversee the cargo properly. Philippine law required delivery of all cargo to the custom agents at the terminal company. At the time of the shipment, the Manila piers were inadequate to handle the great number of incoming vessels, and theft, looting and pilferage on the docks were "notorious." *Id.* at 433. The court recognized that delivery according to the law of a port is not proper "if the

risks to which a particular shipment were subjected were unusual in relation to the risks ordinarily involved in making delivery as required by the usage or law of the port." *Id.* at 436. But the court found that "any such rule has no applicability to the present case since the risks inherent in making delivery in accordance with the law at Manila had long existed and were well-known to both libelant and respondent." *Ibid.*

The risk involved in shipping goods to Lagos was a risk inherent in having the unloading accomplished by the Nigerian-appointed stevedores. In this case also the risk was one of which both the shipper and the carrier were well aware. In order for the WESTWIND's officers to avoid that risk they would necessarily have had to abstain completely from delivering the shipment. Here, unlike the situation in *F.J. Walker,* it was not possible to remedy the unsafe conditions through temporary measures such as postponing unloading for several hours or attempting to effect delivery by different methods. The WESTWIND was charged with the obligation to deliver the cargo of bagged rice to Lagos, and the only delivery allowed by law was at the hands of the Nigerian stevedores.

■ In addition, the risk inherent in releasing the cargo to the government appointed stevedores was a risk to which the cargo was subjected by virtue of port law. As the court in *Tan Hi* explained, "[t]he fact that port usage or law may subject cargo to risks that are not incident to a normal delivery at other ports is immaterial in itself." *Tan Hi, supra,* 94 F.Supp. at 436. Port law is mandatory. It defines the elements of a proper delivery. Absent a risk which is "unusual" relative to the ordinary conditions involved in making delivery according to the law of the particular port, delivery in accordance with that law is indicative of compliance with the Harter Act.

### III. DAMAGE DURING DISCHARGE

■ TAPCO additionally argues that West Africa is liable for the damage which the district court found as a fact occurred

to the rice on board the ship during the unloading by the Nigerian stevedores.[3] Under COGSA, a vessel's owners or operators are required properly and carefully to discharge the goods carried. 46 U.S.C. § 1303(2). However, neither the carrier nor the vessel is responsible for any loss or damage incurred as a result of

> (q) any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage. 46 U.S.C. § 1304(2)(q).

Therefore, once a cargo interest has established a prima facie case of improper delivery[4], the carrier has the burden of establishing exoneration from liability. *THE VALLESCURA,* 293 U.S. 296, 303, 55 S.Ct. 194, 195, 79 L.Ed. 373 (1934); *Metalimport of Romania v. S.S. ITALIA,* 426 F.Supp. 770, 773 (S.D.N.Y.1976).

The district court found, as a matter of law, that West Africa was not liable for the damage which occurred to the packages of rice aboard the ship because "any loss and damage sustained ... was the result of a situation totally beyond its control." In its findings of fact, the court concluded that the vessel interests had "absolutely no control over the stevedores hired to discharge the vessel" and that "[w]hen the stevedores commenced discharging of the M/V WESTWIND, neither West Africa nor its agents had any control over the cargo."

We reverse a district court's findings of fact only if we find them clearly erroneous. Fed.R.Civ.P. 52(a); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware,* 661 F.2d 1044, 1050 n. 12 (5th Cir.1981); *Allstate Insurance Co. v. Imparca Lines, supra,* 646 F.2d at 168. TAPCO argues that the district court's finding was clearly erroneous because the WESTWIND's officers retained their traditional control over the unloading while the stevedores were still on board the ship. Consequently, the carrier should bear responsibility for the damage because the ship's officers failed adequately to supervise the Nigerian stevedores during the unloading. Earlier the thrust of this argument was that the control by ships' officers meant delivery had not taken place. Here the thrust of the argument is that the control was an obligation under COGSA without regard to the technicalities of delivery because the events causing the loss took place aboard ship.

As discussed earlier, the WESTWIND's officers protested the rough handling of the rice and requested assistance from the Nigerian authorities. The only action which the appellants suggest might have been possible in addition to these protests and requests for help was that the officers might have closed the ship's hatches or turned off the electrical power to the ship's winches. In effect, therefore, TAPCO argues that the vessel interests could have prevented the pilferage and theft by refusing to discharge the cargo. As we earlier pointed out, such a contention ignores both the vessel's duty to deliver the cargo and the rule announced in *Tan Hi* that foreign law—here, the obligation to release the cargo to the stevedores chosen and employed by the Nigerian government—modifies the common law elements of proper delivery. *Tan Hi v. United States, supra,* 94 F.Supp. at 436.

---

**3.** We note that discharge of a ship's cargo normally contemplates a process which takes place prior to delivery. In this case, however, Nigerian law mandated that delivery was accomplished when the ship's agents released the cargo to the stevedores in the holds of the ship. Consequently, delivery and discharge occurred at the same moment. The fact that these two events occurred simultaneously controls our finding of freedom from liability for the loss.

**4.** It is uncontested that TAPCO established a prima facie case of liability under COGSA by showing receipt of the rice by the WESTWIND at Mobile, Alabama in good condition, but with damage and loss when the consignee finally obtained possession. 46 U.S.C. § 1303(4); *THE VALLESCURA,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934).

A decision by the United States District Court for the Southern District of New York involves a factual situation strikingly similar to the one we consider today. In *Metalimport of Romania v. S.S. ITALIA,* 426 F.Supp. 770 (S.D.N.Y.1976), suit was brought to recover for damage to coils of electrical steel sheets which was caused by improper unloading techniques in Constanza, Romania. The ship's master had made two protests to the Romanian stevedores concerning the method of discharge,[5] both of which went unheeded. Recognizing that a public carrier of goods is absolutely responsible for the safe delivery of the cargo, unless damage or loss was caused by an "Act of God, public enemy, or the inherent vice of the goods or fault of the shipper and the carrier was not negligent or otherwise at fault," the court found that "the stevedores were controlled by the Romanian government and ... every ship coming in to Constanza had to use them whether they wished to or not." *Id.* at 773. Consequently, the carrier "had no control over the manner in which the stevedores unloaded the cargo," *id.,* and had sustained its burden of proving that it was not responsible for the damage to the coils under the exception provision of 46 U.S.C. § 1304(2)(q).

The regulations requiring that the government-employed stevedores take total charge of the cargo from the ship's holds until finally delivered removed the carrier from any responsibility for losses during the unloading. With a total lack of control compelled by law, the carrier could not be negligent and could not be responsible.

## CONCLUSION

The release of the cargo to the Nigerian stevedores was a proper discharge and delivery according to the law and custom of the Port of Lagos. The damage to the rice during discharge occurred when the cargo was no longer in the carrier's control and without the actual fault, privity, or neglect of the carrier or its agents.[6] The WESTWIND officers delivered the cargo as best they could within the framework of the law, regulations, and conditions at the Port of Lagos.

AFFIRMED.

---

5. For example, the stevedores did not use fork-lifts to unload the steel coils, some of the coils were dropped while removing them from the ship's holds, some coils were left uncovered on the pier, and others were placed in open railroad cars where they were subsequently damaged by rain.

6. Because of our decision that the vessel interests are not liable, we do not reach the appellant's argument that WESTWIND AFRICA bears the burden of proving the exact apportionment of the losses for which it is responsible.