**ABBOTT CHEMICAL, INC., Plaintiff,**

v.

**MOLINOS DE PUERTO RICO, INC., Defendant.**

**No. Civ. 97–1143(SEC).**

United States District Court, D. Puerto Rico.

Aug. 19, 1999.

---

Edgar Colon–Arraras, Goldman, Antonetti & Cordova, San Juan, Puerto Rico, Edna Hernandez–Arroyo, Lasa, Escalera & Reichard, San Juan, PR, for plaintiff.

Miguel G. Mullin, McGrath, North, Mullin and Kratz, P.C., Omaha, NE, Miguel J. Rodriguez–Marxuach, San Juan, PR, for defendant.

### OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is defendant Molinos de Puerto Rico, Inc 's ("Molinos") motion to dismiss the above-captioned action for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(h)(3) (**Dockets # 26, 44, 49, 56, 62, 66, 67, 71, 81**). Said motion was duly opposed by plaintiff Abbott Chemical, Inc. ("Abbott"). For the reasons stated below in this Opinion and Order, Molinos' motion to dismiss for lack of subject matter jurisdiction (**Dockets # 26, 44, 49, 56, 62, 66, 67, 71, 81**) is **GRANTED** and the above-captioned action shall be **DISMISSED.**

**Factual Background**

Plaintiff Abbott is a corporation organized under the laws of the state of Delaware, with its principal place of business in Barceloneta, Puerto Rico. Abbott is a pro-

ducer of an antibiotic Erythromicin®. Defendant Molinos is a corporation organized under the laws of Nebraska, but with its principal place of business in Guaynabo, Puerto Rico, where all of its corporate assets are located. The bulk of its business consists of processing, storing, and distributing grain products to consumers in Puerto Rico.

On January, 1996, Abbott contacted Molinos to inquire about the possibility of Molinos' transporting and storing soy grits in bulk to be utilized in Abbott's fermentation process for the manufacture of the antibiotic Erythromicin®. Until that time, Abbott's supplier of soy grits, Archer Daniel Midland & Company ("ADM") delivered the soy grits used in Abbott's fermentation process to Barceloneta via its containers.

On or about April 10, 1996, Molinos made a presentation to Abbott entitled "Soy Grits New Strategy". During the presentation, Molinos offered to arrange for the transportation of soy grits (to be purchased by Abbott from ADM) from Louisiana to Puerto Rico and store them in silos until needed by Abbott, at which time the soy grits would be transported to Abbott's Barceloneta plant via truck. Sometime thereafter, Molinos and Abbott agreed to an initial shipment of 750 short tons of soy grits.

In early July, 1996, the soy grits were transported by ADM via river barge from Decatur, Illinois, to St. Elmo, Louisiana. On or about July 19, 1996, the vessel Martha B. was loaded with the soy grits in St. Elmo. Representatives of Abbott and Molinos flew to New Orleans, Louisiana, to supervise the loading of the Martha B.

On July 29, 1996, Martha B. voyage 307 arrived at Molinos' Cataño facilities. Shortly thereafter, the soy grits were unloaded from the Martha B. unto Molinos' silos. The unloading process was supervised by personnel from Molinos and Abbott. Molinos maintains that the soy grits were deposited in the silos in the same condition in which they were received from ADM in New Orleans.

On August 6, 1996, Abbott requested that Molinos arrange for the transportation of several loads of soy grits to Abbott's facilities in Barceloneta. Between such date and September 5, 1996, and pursuant to Abbott's instructions, Molinos caused the delivery of fifteen loads of Abbott's soy grits to Barceloneta without any complaints from Abbott.

In early September, 1996, however, Abbott contacted Molinos to inform them that the soy grits had allegedly been contaminated with corn and other substances. As a result, Abbott and Molinos' personnel met in Molinos' Cataño facilities to inspect Molinos' elevators and give Abbott's personnel a better understanding of Molinos' grain handling and storage processes. Abbott and Molinos also discussed new strategies to avoid possible contamination of future shipments.

During the month of September, 1996, several meetings were held between representatives of both companies to discuss new grain handling and storage strategies. During these meetings, Abbott indicated to Molinos that it would not use the soy grits stored in Abbott's Barceloneta facilities; Molinos agreed to coordinate the return of said soy grits to its Cataño facilities. Abbott also requested that Molinos purchase all 750 short tons of soy grits from Abbott, alleging contamination.

According to Abbott, as stated in paragraph 20 of its Second Amended Complaint **(Docket # 15)**, at the September 6, 1996 meeting a Molinos employee "admitted to [Abbott] employees that the source of the contamination was a screw conveyor used to transfer the soy grits from silos 7 and 11 to silo 12." [That Molinos' employee] also admitted Molinos forgot about the use of this screw conveyor, and that the conveyor was never cleaned or inspected prior to the transfer of the soy grits.

In October, 1996 Abbott and Molinos continued to discuss new strategies for the

handling and storage of soy grits. Abbott informed Molinos, however, that because a new strategy could not be implemented before the arrival of a second shipment of soy grits already purchased by Abbott from ADM·and already en route to Puerto Rico, Abbott had decided not to use this shipment in its fermentation process. Because they could not store this second shipment in its Barceloneta facilities, Abbott requested that Molinos also purchase the second shipment of soy grits for use in Molinos' animal feed formulation.

Until October 28, 1996, Molinos and Abbott continued to discuss new strategies for the handling and storage of soy grits. On that date, Molinos received a letter from Abbott requesting payment of $2,428,000.00 in damages allegedly suffered as a result of the purported soy grits contamination. Molinos responded by requesting documentation in support of the damages claimed by Abbott; Abbott filed the instant action on February 6, 1997.

Abbott alleges that as a result of the claimed soy grits contamination several substances and microorganisms were found in its fermentation process which caused a "serious and prolonged adulteration and contamination of Abbott's fermentation processes which resulted in severe damage to Abbott's facilities." Among the damages claimed resulting from the alleged contamination are: a substantial destruction of the merchandise; fermentor yield loss; a dramatic increase in maintenance services; an increase in waste expenses; loss due to fermentor and seed tank dumps; and loss of absorption during contamination crisis.

### Basis for Jurisdiction

Abbott claims that this court has jurisdiction to hear the above-captioned case on three different bases. First, Abbott alleges that this Court has diversity jurisdiction to hear the case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Abbott is a Delaware corporation with its principal place of business in Puerto Rico and Molinos is a Nebraska corporation with its principal place of business in said state. Second, Abbott claims that this Court has admiralty jurisdiction pursuant to 28 U.S.C. § 1333 because the contract at issue is one of a maritime nature. Finally, Abbott claims that this Court has federal question jurisdiction over the instant case pursuant to 28 U.S.C. § 1331 because the contract involved arises under the Harter Act, 46 U.S.C. § 190, et seq. We shall address each of these arguments in turn to determine whether the Court has jurisdiction to hear this case.

### Applicable Law—Rule 12(h)(3) Standard

 Fed.R.Civ.P. 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." As the First Circuit Court of Appeals has cogently stated, "federal courts are not at liberty to overlook limitations on their subject matter jurisdiction." *A.M. Francis v. Goodman,* 81 F.3d 5, 8 (1st Cir.1996). Thus, if the Court determines, as a threshold matter, that subject matter jurisdiction does not exist, it must dismiss the case and not make any determination on the merits of the same.

 In resolving a motion to dismiss for lack of subject matter jurisdiction, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of plaintiff." *Aversa v. United States,* 99 F.3d 1200, 1210 (1st Cir.1996). That said, however, the Court may consider material outside of the pleadings of the action when dealing with a factual attack on subject matter jurisdiction, such as affidavits and testimony, without converting the motion to dismiss into one for summary judgment. *Caribbean Mushroom Co. Inc. v. Government Development Bank,* 980 F.Supp. 620, 622 (D.P.R.1997); *Moreno v. John Crane, Inc.,* 963 F.Supp. 72, 73 (D.P.R.1997). Furthermore, it is the plaintiff who bears the

ultimate burden of proving that subject matter jurisdiction exists, *Aversa*, 99 F.3d at 1209, and "argumentative inferences favorable to the pleader should not be drawn." *Atlantic Mutual Insurance Company v. Balfour Maclaine International Ltd.*, 775 F.Supp. 101, 104 (S.D.N.Y.1991).

### Applicable Law and Analysis—Jurisdiction under the diversity statute

■ As stated above, one of the ways in which Abbott seeks to establish federal jurisdiction is by alleging in the complaint that Abbott and Molinos are citizens of different states and that, as such, diversity jurisdiction pursuant to 28 U.S.C. § 1332 applies. However, in its motion to dismiss for lack of subject matter jurisdiction, Molinos asserts that while it was incorporated in Nebraska, its principal place of business is in Puerto Rico and it should thus be considered a citizen of Puerto Rico for diversity purposes. Since Abbott is a citizen of Puerto Rico, no diversity would exist between the parties and § 1332 could not be used as a basis to assert jurisdiction.

■ 28 U.S.C. § 1332(c)(1) reads in relevant part: "For purposes of this section ... a corporation shall be deemed to be a citizen of any State in which it has been incorporated and of the State where it has its principal place of business ..." It is clear therefore that a corporation is both a citizen of its state of incorporation and the state where it has its principal place of business. According to the uncontroverted evidence presented by defendant, Molinos is a citizen of both Nebraska and Puerto Rico. Because the citizenship of plaintiff and defendant is not diverse, diversity jurisdiction under 28 U.S.C. § 1332 does not exist, and said basis for asserting subject matter jurisdiction in the above-captioned case must be **DISMISSED**.

### Applicable Law—Federal Admiralty Jurisdiction

28 U.S.C. § 1333(1) grants federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction ..." The United States Supreme Court has found that defining the existence of admiralty jurisdiction over contracts is quite difficult. To that effect, the Court has stated that "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

■ The general principle holds that admiralty jurisdiction may be exercised over a contract if the subject matter of the contract is wholly maritime. *Puerto Rico Maritime Shipping Authority v. Luallipam, Inc.*, 631 F.Supp. 1472, 1474 (D.P.R. 1986). The subject matter of a contract has been held to be wholly maritime if it "directly concern[s] navigation or commerce on navigable waters." *Id.* As the First Circuit Court of Appeals has held, "[w]hether a contract action falls within admiralty jurisdiction depends upon the subject matter of the contract rather than the place where the contract was entered into or is to be performed." *Luvi Trucking, Inc. v. Sea–Land Service, Inc.*, 650 F.2d 371 (1st Cir.1981).

■ Normally, if a contract consists of both maritime and non-maritime obligations, admiralty jurisdiction will not lie. *Berkshire Fashions, Inc. v. The M.V. Hakusan II*, 954 F.2d 874, 881 (3d Cir.1992). There are, however, two exceptions to said black-letter rule. First, admiralty jurisdiction will apply to a "mixed" contract, i.e. one with maritime and non-maritime obligations, "when the maritime obligations can be separately enforced without prejudice to the rest." *Atlantic Mutual Insurance Company v. Balfour Maclaine International Ltd.*, 968 F.2d 196, 199 (2d Cir. 1992) (internal citations omitted). Second, if the non-maritime obligations are merely "incidental" in what would otherwise be a wholly maritime contract, then admiralty jurisdiction may be exercised. *Id.* Thus, in

order for the Court to assume admiralty jurisdiction over a "mixed" contract, the non-maritime portion of the contract must either be severable from the maritime obligations, or it must be merely incidental to the maritime obligations. *See also Transatlantic Marine Claims Agency, Inc., M/V HYUNDAI EMPEROR v. Ace Shipping,* 109 F.3d 105 (2d Cir.1997).

### Analysis—Admiralty jurisdiction may not be exercised over this "mixed" contract

 The first step we must take in order to decide whether admiralty jurisdiction may be exercised over the contract between Abbott and Molinos is to decide whether the contract at issue is "wholly maritime" or "mixed". Upon undertaking such an analysis, it is clear to the Court that the obligations between the parties encompassed both maritime and non-maritime issues. The contract between Abbott and Molinos provided for one fixed price to be paid for the 750 short tons of soy grits to be both initially shipped by sea and subsequently stored in land. The obligations between them fall clearly within the scope of a "mixed" contract, where the maritime obligations consisted of the shipping of the soy grits from Louisiana to Puerto Rico, and the non-maritime obligations consisted of the storage and subsequent transfer of the soy grits from Molinos' facilities to Abbott's.

Abbott's argument that because this contract involved the carriage of goods by sea it is necessarily wholly maritime must fail. Such circular logic would negate the existence of the very contract at issue here, that of a mixed contract. If all contracts which deal in part with maritime shipping are thus somehow infused with a wholly maritime nature, the rule which prescribes that admiralty jurisdiction will not lie over mixed contracts would be redundant and inapplicable in all instances. The exception must not be allowed to swallow the rule, and such would be the case if the Court were to adopt the rationale espoused by plaintiff in its opposition to defendant's motion to dismiss. One district court, addressing this very argument, cogently stated, "To the extent that plaintiff argues that the entire contract is a maritime contract because one portion of the contract ... is maritime, the Court is not persuaded." *St. Louis Cold Drawn, Inc. v. Beelman River Terminals, Inc.,* 863 F.Supp. 1013, 1017 (E.D.Missouri 1994).

Thus, we find that the contract at issue between the parties is clearly "mixed", and as such, we must determine whether either of the exceptions to the rule that admiralty jurisdiction applies only to wholly maritime contracts applies.

 First, we must determine whether the maritime and the non-maritime obligations in the contract between Abbott and Molinos are severable, and if they are, then admiralty jurisdiction may be exercised over the maritime obligations. It is an undisputed fact that the contract between the parties contained a single fixed rate for all the services to be provided by Molinos, the maritime shipping, as well as the storage and land transportation of the soy grits. When faced with that very question, courts have held that when a mixed or intermodal contract provides for a fixed, single freight rate, the maritime and the non-maritime obligations within the contract are not severable and therefore admiralty jurisdiction does not lie. *Kuehne & Nagel (AG & CO.) v. Geosource, Inc.,* 625 F.Supp. 794, 798 (S.D.Texas,1986), *vacated on other gds,* 874 F.2d 283 (5th Cir.1989). In that case, the Court stated that when "each bill of lading contains a fixed, single rate for sea carriage, as well as overland transportation" and "there was no attempt to itemize the maritime and non-maritime services separately, the Court cannot distinguish between the two sections." *Id.* In light of this, we find that the maritime and the non-maritime obligations in the contract between Abbott and Molinos are non-severable and this exception to the non-assertion of jurisdiction is inapplicable.

■ Second, the Court could exercise admiralty jurisdiction over the contract if we found that the non-maritime obligations in the contract were merely incidental to the maritime ones. We find that this exception is also inapplicable. The contract between Abbott and Molinos consisted not only of the maritime shipping of the soy grits from Louisiana to Puerto Rico, but also provided for the storage of said soy grits in Molinos' facilities, and the subsequent transportation overland to Abbott's facilities as needed for the manufacturing process of Erythromycin®. The storage and subsequent transportation appears to be an essential element of the contract, insofar as Abbott did not possess the storage facilities for the 750 short tons of soy grits that it purchased in bulk from ADM, and mere shipping of the material was previously done in smaller quantities directly from ADM. Thus, it cannot be said that this storage and subsequent transportation overland is merely incidental to the maritime shipping of the soy grits. As such, admiralty jurisdiction may not be exercised over this mixed contract based upon this narrow exception and said basis for exercising this Court's jurisdiction must be **DISMISSED.**

## Applicable Law—the Harter Act's jurisdictional breadth

■ The Harter Act, codified at 46 U.S.C.App. §§ 190–196, governs the carrier's liability prior to loading and after discharge. As stated by a district court, the Harter Act "imposes a duty on a carrier to make proper delivery of the cargo and nullifies attempts by carriers to be relieved from liability for loss or damage arising from negligence, fault, or failure in proper delivery." *Velco Enterprises, Ltd. v. S.S. Zim Kingston,* 858 F.Supp. 36, 38 (S.D.N.Y.1994) (internal citations omitted).

■ Courts have held that the Harter Act is a maritime law, and solely regulates the liability of seagoing carriers. *Jagenberg, Inc. v. Georgia Ports Authority,* 882 F.Supp. 1065 (S.D.Ga.1995). That court

held that the Harter Act "is at its core a maritime law" and that it was "unwilling to rule that simply because private parties enter an intermodal agreement federal maritime legislation is thus extended far beyond its congressionally intended bounds." *Id.* at 1077. Thus, the Harter Act is applicable to a carrier's liability pursuant to an intermodal contract such as the one at issue here only to the extent that the obligations claimed to be violated are maritime.

According to Section 1 of the Harter Act, a carrier is liable for damage to the cargo at issue until "proper delivery" of the same has been made. The Ninth Circuit Court of Appeals described the liability regime behind the Harter Act as follows: "[A]ny attempt by the carrier to avoid liability for losses arising before delivery must fail. Once proper delivery has been made, however, the carrier's liability, as far as the Harter Act is concerned, is at an end." *Isthmian Steamship Company v. California Spray–Chemical Corporation,* 300 F.2d 41, 43 (9th Cir.1962).

It is thus essential to determine whether "proper delivery" was effected in order to determine whether the Harter Act is applicable to the controversy at hand and constitutes an independent source of jurisdiction so that the Court may hear the instant case. The Harter Act itself does not define what a "proper delivery" is—we must thus turn to caselaw to determine whether "proper delivery" was made of the goods in the instant case.

■ Proper delivery may be actual or constructive. When defining constructive delivery, courts have held that "[i]n the most general terms, proper delivery requires discharge of the cargo upon a fit and customary wharf." *Allstate Insurance Company v. Imparca Lines,* 646 F.2d 166, 168 (5th Cir.1981). Furthermore, to determine whether discharge of the cargo has occurred on a "fit and customary wharf," the Court finds that "no rule is better settled than that delivery must be

according to the custom and usage of the port." *Id.* (internal citations omitted). Another court of appeals has defined "proper delivery" as the duty of the carrier "to deliver the goods from wharf to wharf, notify the consignee of the vessel's arrival and to protect the cargo until the consignee had a reasonable opportunity to remove it." *Farrell Lines Incorporated v. Highlands Insurance Company,* 696 F.2d 28, 29 (2d Cir.1982). *See also Philip Morris v. American Shipping Co. Inc.,* 748 F.2d 563, 567 (11th Cir.1984); *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 F.2d 1252, 1255 (5th Cir.1983). The Ninth Circuit has stated that "every carrier is responsible for the discharge of cargo from the vessel to a safe place." *Isthmian Steamship,* 300 F.2d at 44.

One court has held that a contract for carriage of goods by sea does not "continue[ ] indefinitely after carriage." *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 807, fn. 5 (2d Cir.1971). It has held that if the shipper is not diligent in picking up its goods once it has been notified of their arrival and the goods are damaged, "it seems likely that any dispute between the parties would no longer be within the admiralty jurisdiction, their relative rights and duties becoming a matter for the common law." *Id.* Following its holding in *Leather's Best,* the Second Circuit found that when the carrier was acting as a warehouseman after the goods were delivered to a terminal at the wharf, any action that proceeded against the carrier was not within admiralty jurisdiction, but was governed instead by state law. *Colgate Palmolive Company v. S/S Dart Canada,* 724 F.2d 313 (2d Cir.1983).

Similarly, the Fifth Circuit has found that when the cargo has been delivered upon a fit wharf, and the consignee had adequate notification of the arrival of the cargo, subsequent damage to the cargo is not governed by the Harter Act, but rather by state tort law. *Metropolitan Wholesale Supply, Inc. v. The M/V Royal Rainbow,* 12 F.3d 58 (5th Cir.1994). The Second Circuit has held that when the carrier relinquishes control of the cargo to the entity that is either transporting or storing it, that constitutes proper delivery under the Harter Act. *Farrell Lines,* 696 F.2d at 29. The Fourth Circuit has found that whether the cargo was "at the disposal" of the consignee at the time of the damage is a determining factor as to whether proper delivery had occurred so as to bring the damages outside of the scope of liability of the Harter Act. *Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 F.3d 734, 742 (4th Cir.1993).

**Analysis—Proper Delivery Occurred under the Harter Act**

■ Upon an examination of the facts, we find that proper delivery of the goods had been effected prior to any of the damages to the soy grits claimed by Abbott; as such, the Harter Act is inapplicable to the controversy at hand and Abbott may only recover from Molinos based upon Commonwealth law. Proper delivery as defined by the Harter Act occurred in this case when the soy grits were deposited in Molinos' silos, awaiting subsequent delivery to Abbott's facilities on a need basis. One of the main reasons why Abbott and Molinos contracted for this shipping and subsequent storage of soy grits was because Abbott did not have sufficient space in its own warehouse to store bulk quantities of soy grits, and up to that point had been purchasing its soy grits directly from ADM in smaller quantities.

■ Once the soy grits were deposited in Molinos' silos, proper delivery was effected because it is uncontroverted that at that point the cargo was "at the disposal" of Abbott. Molinos correctly states that at that point its relationship with Abbott became that of a warehouseman, and pursuant to the caselaw, liability under the Harter Act may not attach. Abbott's argument that proper delivery only occurred upon the subsequent overland delivery of the soy grits to its Barceloneta plant pretends to extend the scope of the Harter Act impermissibly. The Harter Act is in

its essence a maritime law, and as such, its scope may not be judicially extended to cover damages that clearly occurred in the overland portion of an intermodal contract.

Furthermore, Abbott's attempt to argue that some of the adulteration of the soy grits occurred during the sea voyage aboard the Martha B. is belied by two key pieces of evidence. First, it is uncontroverted that Molinos had sent over fifteen shipments of soy grits to Abbott for use in its fermentation processes before Abbott found the substances which prevented any subsequent use of the soy grits stored in Molinos' silos. It is clear that whatever contamination the soy grits suffered was subsequent to their proper delivery; otherwise, Abbott would have complained about adulteration after it had received its first shipment. Furthermore, Abbott itself claims that a Molinos employee admitted that the adulteration had occurred because of a screw conveyor used to transport the grits from silos 7 and 11 to silo 12, something which clearly occurred after the soy grits had been stored in Molinos' facilities.

In short, we find that proper delivery of the soy grits was effected when the same were stored in Molinos' facilities. At that point, the relationship between Abbott and Molinos changed and Molinos ceased to be the shipper and became the warehouseman. Because of this, Harter Act liability does not attach. Abbott's argument that at least some of the adulteration occurred during the sea voyage is clearly contradicted by all available evidence, and said assertion may not serve to create the basis for federal jurisdiction. Therefore, plaintiff's claims pursuant to the Harter Act must also be **DISMISSED.**

## Conclusion

Pursuant to the above discussion, Molinos' motion to dismiss for lack of subject matter jurisdiction (**Dockets # 26, 44, 49, 56, 62, 66, 67, 71, 81**) is **GRANTED** and the above-captioned action shall be **DIS-MISSED.** Judgment shall be entered accordingly.

**SO ORDERED.**