753 A.2d 617

M.C. MACHINERY SYSTEMS, INC., PLAINTIFF–APPELLANT, v.
MAHER TERMINALS, INC., DEFENDANT–RESPONDENT.

Argued January 18, 2000—Decided June 29, 2000

*Anthony J. Pruzinsky* argued the cause for appellant (*Hill Rivkins & Hayden*, attorneys; *Mr. Pruzinsky, John J. Sullivan* and *Laura R. Landau*, of counsel; *Mr. Sullivan*, on the brief).

*James M. Kenny* argued the cause for respondent (*Kenny & Stearns*, attorneys; *Michael C. Mulé*, on letter brief).

The opinion of the Court was delivered by

O'HERN, J.

If a strained metaphor may be forgiven, we hesitate to dip our toes into the waters of admiralty law. Fortunately, we need not deal here with such quaint notions as that a ship is a person, *The Osceola*, 189 *U.S.* 158, 23 *S.Ct.* 483, 47 *L.Ed.* 760 (1903), or that when cargo and vessel come together, they are "married at transport." *Farrell Ocean Services, Inc. v. United States*, 524 *F.Supp.* 211, 214 (1981). These subtleties have appealed to ones such as Messrs. Gilbert and Sullivan who described this law as the "monarch of the sea." *De Sole v. United States*, 947 *F.*2d 1169, 1176 n. 11 (4 th Cir.1991). And rightly so. The law of the sea, with other institutions of antiquity, helped to shape the civilizations with which we are most familiar. Its unifying principles are as necessary to the world of commerce today as then. The issue in this case is a recurring one—when ceases the liability of a ship owner for the goods of a merchant consigned to the vessel?

A cursory review of history helps to put the issue in perspective. For this purpose, we draw on Samuel Robert Mandelbaum, *International Ocean Shipping and Risk Allocation for Cargo Loss, Damage, and Delay: A U.S. Approach to COGSA, Hague–Visby, Hamburg, and the Multimodal Rules*, 5 *J. Transnat'l L. & Pol'y* 1 (1995). For convenience, we shall eliminate formal citations to the

various laws mentioned therein, referring to the laws or conventions by their familiar names.[1]

■   The rights and liabilities of the carrier and shipper in maritime law predate the present era.   Under Roman law, the carrier insured the safety of the goods delivered and therefore was liable for all loss or damage.   In time, losses due to shipwreck and piracy were excepted from this strict liability rule.   By the 1500s, European carriers were legally excused for the non-delivery or damage to cargo, resulting from bad weather, perils of the sea, or robbery.   Bills of lading[2] of that time included those defenses, while still holding the carrier liable for any loss due to its negligence.   As of the early nineteenth century, a marine carrier was described as an "insurer of the goods."   Unless the carrier could prove one of four excepted causes or that its negligence had not contributed to the loss of goods, the carrier was held strictly liable.

By the end of the century, however, carriers promoted a different risk allocation.   To avoid liability for any cargo damage

---

[1] In the terminology of maritime law, the owner or charterer who enters into a contract of carriage with a shipper is called a "carrier."   A "ship" is defined as any vessel used for the carriage of goods by sea.   Those who have an interest in the goods placed on the ship as cargo are called "merchants."   Merchants may be either shippers or receivers/consignees of the cargo.   A "stevedore" is a contractor engaged by a carrier to move waterborne freight on ships berthed at piers or marine terminals.   A "marine terminal" is a location that includes piers and storage areas used primarily for the moving, warehousing, distributing, or packing of waterborne freight to or from such piers.   A "longshoreman" is a person who performs the physical labor or services involving the movement of freight at a marine terminal.

[2] A bill of lading is a receipt for goods and constitutes the contract for carriage and delivery of goods between the shipper and carrier.   G. Gilmore & C. Black, Jr., *The Law of Admiralty* § 3-1 (2d ed.1975); *Black's Law Dictionary* 210 (rev. 4th ed.1968).   The bill also serves as a title to the goods.   Jocelyn Dube, *Canadian Perspectives on the Impact of the CMI Rules for Electronic Bills of Lading on the Liability of the Carrier Towards the Endorsee, 26 Transp. L.J.* 107, 109 (1998).   It continues to govern the rights and obligations of the parties until delivery.   *David Crystal, Inc. v. Cunard Steamship, Inc.,* 339 *F.*2d 295, 297 (2d Cir.1964), *cert. denied,* 380 *U.S.* 976, 85 *S.Ct.* 1339, 14 *L.Ed.*2d 271 (1965).

and loss, carriers began to include broad exculpatory clauses in the bills of lading. As a result, the carriers' bills of lading became "so unreasonable and unjust in their terms as to exempt [the carrier] from almost every conceivable risk and responsibility as carrier of the goods." *Hearings before the Committee on Merchant Marine and Fisheries House of Representatives*, 74th Cong., 2d Sess. 8 (1936), reprinted in 3 *The Legislative History of the Carriage of Goods by Sea Act* (Michael F. Sturley ed. & Caroline Boyer trans., 1990) Bills of lading also were so long and complex that it became impossible for shippers to read the bills of lading in the ordinary course of business. The carriers' continual addition of newer and stricter conditions in the bills of lading aggravated this problem. To redress the inequitable bargaining positions, American courts invalidated many of these conditions on public policy grounds. Furthermore, Congress enacted the Harter Act in 1893 to counteract the carriers' superior bargaining power. In other countries however, such as the United Kingdom, courts upheld many of the carriers' terms. Because the law governing shipments from the United States differed from most parts of the world, a movement for international uniformity developed using Harter Act theory.

In 1924, twenty-six nations adopted an international convention, commonly called the Hague Rules, which established bases for shipowner liability for cargo loss or damage. Among its many provisions, the Hague Rules provide shipowners with seventeen defenses and limited liability to $500 per package or customary freight unit. The United States domestically implemented the Hague Rules by enacting the Carriage of Goods by Sea Act (COGSA), 46 *U.S.C.App.* §§ 1300 to –15, in 1936 and ratifying the convention in the following year.

COGSA provides international uniformity and balances the power between shippers and owners. The Act applies from "tackle to tackle," *i.e.,* the time from loading of the goods until their discharge from the ship. 46 *U.S.C.App.* § 1301(e). However, the parties may contractually extend the coverage of COGSA after discharge until delivery occurs, at which point the contract of

carriage terminates. *B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 *F.*2d 1305, 1307 (4th Cir.1983); *see also Leather's Best v. Mormaclynx,* 451 *F.*2d 800, 807 (2d Cir.1971) ("[T]he contract continues to govern the relationship between a shipper and a carrier after discharge but before delivery."). Although COGSA did not completely supersede the Harter Act, it does contain significant changes.[3] Most importantly, COGSA provides the carrier and the ship a $500 per package liability limitation in the event of damage to cargo. 46 *U.S.C.App.* § 1304(5). This limitation applies unless the shipper declares the value of the cargo in the bill of lading. *Ibid.*

This appeal requires the Court to decide the amount of a marine terminal operator's liability for damage caused to a shipper's plastic injection molding machine while it was being stored in a marine terminal following carriage overseas. The Court must resolve whether defendant's liability is limited to $500 pursuant to an alleged extension of COGSA contained in the bill of lading, or whether defendant is liable for approximately $370,000, the full amount of damages claimed by plaintiff, pursuant to New Jersey bailment law.

---

[3] "With the enactment of the Carriage of Goods by Sea Act in 1936, the scope of that Act in effect limited the applicability of the Harter Act to domestic trade, unless the Carriage of Goods by Sea Act is specifically made applicable in the bill of lading or similar document, and to foreign and domestic trade up to the point where the goods are loaded on board, and from the time they are discharged from the vessel until proper delivery is made. COGSA does not prevent a carrier or shipper from entering into an agreement as to liability prior to loading or after discharge, and accordingly, parties may agree to extend the COGSA provisions to cover the time when the goods are in the carrier's possession prior to loading and subsequent to discharge. However, COGSA is not to be construed as superseding the Harter Act or any other applicable law insofar as they relate to the duties, responsibilities, and liabilities of the carrier before goods are loaded or after they are discharged from the ship. Thus, provisions of the Carriage of Goods by Sea Act that are inconsistent with the Harter Act provision prohibiting stipulations in bills of lading relieving from negligence liability cannot be incorporated into a bill of lading to cover responsibilities of the carrier after discharge and before delivery of cargo." 70 *Am.Jur.2d Shipping* § 692 (1987).

## II.

Plaintiff is an insurance company suing in subrogation in the name of its policy holder, M.C. Machinery Systems, Inc., a shipper ("M.C. Machinery" or "Shipper"). M.C. Machinery hired Dia International Traffic Co., Ltd. ("Dia International"), a non-vessel owning common carrier, to transport a 42,000 kilogram (41.3 English tons) plastic injection molding machine from Nagoya, Japan to Glendale Heights, Illinois. Dia International arranged with an ocean carrier, Hapag–Lloyd America, Inc. ("Hapag–Lloyd" or "Carrier"), to carry the cargo overseas to the Port of New York–New Jersey, located at Port Elizabeth, N.J. Hapag–Lloyd issued a bill of lading for the cargo to be shipped aboard its ocean vessel, "California Saturn."

Defendant Maher Terminals, Inc. ("Maher" or "terminal operator") was hired by Hapag–Lloyd to discharge the cargo from the vessel when it docked at Port Elizabeth, and to store the machine in its terminal until a freight forwarder hired by plaintiff arrived to pick it up. Maher had a terminal operating and stevedoring contract with Hapag–Lloyd pursuant to which it agreed to discharge cargo from Hapag–Lloyd's vessels, including the California Saturn, and provide storage for the cargo until the consignee came to retrieve it.

On November 7, 1995, the California Saturn docked at Port Elizabeth, and Maher discharged the cargo from the vessel by a crane to the stringpiece, a section of the pier extending alongside the vessel. The machinery was then placed onto a low-bed trailer, known as a mafi, and hauled from the stringpiece to a storage area in Maher's terminal, called the Breakbulk/Ro–Ro yard, where the cargo was stored until plaintiff's trucker arrived. The storage area was on property leased from the Port Authority of New York and New Jersey and was several hundred yards from the pier. Six days after the cargo arrived, one of Maher's crane operators was lifting the molding machine off the mafi to place it on the ground in preparation for plaintiff's trucker's pickup, when a cable slipped, causing the cargo to fall to the ground.

On August 1, 1996, plaintiff filed a complaint against defendant in the Law Division for damages to the machinery in the amount of $369,932. Maher raised defenses under the bill of lading, including a limitation on liability. Plaintiff moved to strike the defense on summary judgment, and defendant made a cross motion for partial summary judgment to limit its liability to $500 under COGSA. The parties stipulated that if the court found that liability was limited to $500 per package, then judgment was to be entered in that amount. The Law Division denied plaintiff's motion for summary judgment and granted defendant's motion limiting its liability to $500. In its written opinion, the Law Division reasoned that the $500 limitation applied because M.C. Machinery did not declare the value of the cargo in the bill of lading. Additionally, the court ruled that the Harter Act extended the period by which the bill of lading governs so that any third parties enjoying protection of the Himalaya clause [4] would continue to be protected until proper delivery of the goods. The court found that defendant's stringpiece was not "a fit and customary wharf" and that stripping cargo from the mafi occurs before proper delivery under the Harter Act. In an unreported opinion, the Appellate Division affirmed the Law Division's decision for essentially the same reasons stated in the Law Division's opinion. This Court granted plaintiff's petition for certification. 161 *N.J.* 334, 736 *A.*2d 527 (1999).

## III.

**A. Does State or Federal Law Govern the Liability of a Marine Terminal Operator's Handling of Cargo that has been Discharged from an Ocean Vessel?**

█ Plaintiff has a straight-forward argument. This case has nothing to do with maritime or admiralty law. The goods were

---

[4] A Himalaya clause is an exculpatory provision seeking to extend to non-carriers the protections available to carriers under COGSA. The principal benefits are the $500 limitation of liability. Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law*, § 10–8, 40 (2d ed.1994).

damaged while on dry land, having been removed from the vessel. Therefore, Maher should be responsible as would any other bailee of goods in New Jersey.

Unfortunately, it is not quite that simple. As noted, the marine terminal was located on the Port Authority's property. The marine terminal appears to be a functional part of the complex system of ocean carriage of goods. The stringpiece, as its name implies, is often or normally a narrow pier immediately alongside the vessel. If the vessel were to stack all the discharged goods on the stringpiece until delivery were accomplished, a bottleneck would be inevitable. Because a merchant cannot always be immediately present to remove the goods from the pier, a workable system has evolved under which the carrier arranges with another (the stevedore) to hold the cargo in a secure place (the marine terminal) for a reasonable time. The carrier pays the stevedore to carry out this function on its behalf until the merchant picks up the cargo at the specified time. If the merchant does not pick up the goods by the specified time, the stevedore may impose demurrage charges (a charge or rent for the storage of the cargo).

Because of this integral relationship between the carrier and stevedore, federal courts have determined that federal law should govern the rights and liabilities of the parties in cases arising from disputes between the shipper and stevedore.

The Fourth and Eleventh Circuits have held that an action against a marine terminal operator for damage to cargo is within federal maritime jurisdiction, not state law. *Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 *F.*3d 734 (4 th Cir.1993); *B. Elliott, supra,* 704 *F.*2d at 1307 (applying federal law to suit in district court against stevedore/terminal operator when provisions of COGSA contractually extended to post-discharge period); *Koppers Co., Inc. v. S/S Defiance,* 704 *F.*2d 1309, 1312 (4 th Cir.1983). *Wemhoener* stated: "so long as the bill of lading is still covered by COGSA or the Harter Act, which includes the period after the discharge of the goods but prior to delivery, the rights and obligations of third party beneficiaries under a Himalaya clause,

should be determined with reference to the bill of lading, not state law, even if state law is inconsistent." *Id.* at 740. The court reasoned that a contract of carriage embodied by a bill of lading represents the parties' intentions at the time the contract was made, and therefore should be interpreted according to its terms, "without reference to the varying state laws of this nation's many ports." *Ibid.*

The Eleventh Circuit has also upheld the application of federal law to claims against third-party agents of the carrier for damage to cargo. *See Hiram Walker & Sons v. Kirk Line,* 877 *F.*2d 1508, 1516 (11 th Cir.1989), *cert. denied,* 514 *U.S.* 1018, 115 *S.Ct.* 1362, 131 *L.Ed.*2d 219 (1995) (holding that stevedore would be protected by contractual COGSA provision against suit by the owner for damage to cargo occurring two days after discharge but during storage at the terminal); *Generali v.· D'Amico,* 766 *F.*2d 485 (11 th Cir.1985) (affirming the district court's exercise of admiralty juris- diction over a suit against the carrier and stevedore for cargo damage at the terminal eighteen days after discharge from the vessel); *Certain Underwriters of Lloyds' v. Barber Blue Sea Line,* 675 *F.*2d 266, 268 (11 th Cir.1982) (affirming decision of district court sitting in admiralty that terminal operator was protected by contractual COGSA limitation).

In *Jagenberg, Inc. v. Georgia Ports Authority,* 882 *F.Supp.* 1065, 1071 (S.D.Ga.1995), the court held that federal maritime law, not state law, applies to the shipper's claims against the terminal operator for damage to the goods while in storage. The *Jagen- berg* Court recognized the importance reviewing the overall con- text of a carriage of goods contract:

> Admittedly, in the instant case, there was simply damage to property "that happened to occur on a dock," but that damage occurred in the context of fulfilling a contract for the delivery of goods. COGSA and the Harter Act were thus implicated, and these bodies of law pre-empt state law whenever they are applica- ble.
>
> [*Ibid.* (quoting *Wemhoener Pressen, supra,* 5 *F.*3d at 740).]

So long as COGSA or the Harter Act applies to the bill of lading, the claim against the carrier or its agent is governed by

federal maritime law. The other side of the coin is that a claim for conversion must be brought under state law when delivery of the cargo was in accordance with COGSA and the Harter Act. *Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow,* 12 *F.*3d 58 (5 th Cir.1994). This approach promotes uniformity in the law's treatment of such claims.

### B. Are the Liabilities of the Marine Terminal Operator Limited to the Amount of $500 Set Forth as the Value of the Cargo in the Bill of Lading?

COGSA governs "all contracts for the carriage of goods by sea to or from ports of the United States and foreign trade," provided that the contract of carriage is evidenced by a bill of lading or similar document of title. 46 *U.S.C.App.* § 1312; *Mendes Junior Int'l Co. v. M/V Sokai Maru,* 43 *F.*3d 153, 155 (5 th Cir.1995). COGSA defines the rights and duties of the parties "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 *U.S.C.App.* § 1301(e). One of the broad obligations imposed on the carrier by COGSA is to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 *U.S.C.App.* § 1303(2). The Harter Act, 46 *U.S.C.App.* §§ 190–195, obligates the carrier to provide "proper delivery," which has been defined to mean discharge of the cargo upon a fit and customary wharf. *Metropolitan Wholesale, supra,* 12 *F.*3d at 61. However, proper delivery may be modified by the customs and usage of the port. *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 *F.*2d 1252, 1256 (5 th Cir.1983) (citing *Allstate Ins. Co. v. Imparca Lines,* 646 *F.*2d 166, 168 (5 th Cir.1981)).

As noted, COGSA generally provides the carrier with a $500 per package liability limitation for cargo damage between the time cargo is loaded onto the ship to the time it is discharged. 46 *U.S.C.App.* § 1304(5). This limitation applies unless the merchant/shipper declares the value of the cargo in the bill of lading. *Ibid.* In this case, the shipper failed to declare the value of the

cargo in the bill of lading.[5] It is without question that if the carrier had negligently damaged the cargo during sea voyage, the $500 limitation would have applied.

The question presented however, is whether federal law similarly limits the non-party stevedore's liability to $500. Although COGSA applicability ends when the ship's tackle, *i.e.*, loading and unloading equipment, is removed from the cargo, a carrier and shipper are allowed to enter into a special agreement to extend COGSA's coverage to the period before loading and after discharge of the goods. *See* 46 *U.S.C.App.* § 1307 ("nothing contained in this chapter shall prevent a carrier or a shipper from entering into any agreement ... as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody ... of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea"); *Mori Seiki U.S.A., Inc. v. M/V Alligator Triumph*, 990 *F*.2d 444, 447 (9th Cir.1993) (extension of COGSA's $500 liability limitation to period before loading and after discharge is "precisely the kind of extension ... contemplated and authorized by 46 *U.S.C.App.* § 1307").

The limits of the stevedore in this case are expressly governed by COGSA because clauses 5 and 6 of the bill of lading extend the $500 limitation to the period after discharge. Clause 5

---

[5] The reverse side of the bill of lading contained a section entitled "Ad Valorem" describing the value of the goods shipped, which provided:

The Merchant agrees and acknowledges that the Carrier has no knowledge of the value of the Goods, and that higher compensation than that provided herein may not be claimed unless, with the consent of the Carrier, the value of the goods declared by the Shipper prior to the commencement of the Carriage is stated on this Bill of Lading and extra Freight Paid, if required. In that case, the amount of the declared value shall be substituted for the limits laid down in the Bill of Lading. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

The section on the face of the bill of lading providing for "Shipper's Declared Value" was left blank.

of the Bill of lading, entitled, "Carrier's Responsibility, Port–to–Port," states in pertinent part:

> The Carrier shall be under no liability whatsoever for loss or damage to the Goods howsoever occurring if such loss or damage arises prior to loading onto or subsequent to discharge from the vessel. Notwithstanding the above, in case and to the extent any applicable compulsory law provides to the contrary, the Carrier shall have the benefit of every right, defence [sic], limitation and liberty in the Hague Rules as applied by this clause during such additional compulsory period of responsibility, notwithstanding that the loss or damage did not occur at sea. The U.S. COGSA shall govern while the Goods are in the custody of the Carrier or his Sub–Contractor at the sea-terminal in the United States of America before loading onto the Vessel or after discharge therefrom as the case may be. . . .

Clause 6 of the bill of lading, entitled "Carrier's Responsibility, Multimodal Transport," states, in relevant part: "Carrier undertakes to perform and/or in his own name to procure performance of the Carriage from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or Place of Delivery, whichever is applicable." Clause 6 subsection (2)(b) stated, in relevant part, the liability of the carrier will be determined: "In case of shipments to or from North America by the provisions of [COGSA] if the loss or damage is known to have occurred during sea-carriage to or from the USA or during Carrier's custody of the Goods before loading or after discharge in ports of the USA. . . ."

The reverse side of the bill of lading also contains a so-called "Himalaya clause" in paragraph 4(2),[6] extending any of Hapag–

---

[6] The Himalaya clause, found in clause 4(2) of the Hapag–Lloyd Bill of lading, stated:

> The merchant undertakes that no claim or allegation shall be made against any Person whomsoever by whom the Carriage is performed or undertaken (including all Sub–Contractors of the Carrier) other than the Carrier, which imposes or attempts to impose upon any such Person, or any vessel owned by any such Person, any liability whatsoever in connection with the Goods or the Carriage of the Goods, whether or not arising out of negligence on the part of such Person and, if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof. Without prejudice to the foregoing every such Person shall have the benefit of every right, defence [sic], limitation, and liberty of whatsoever nature herein contained or otherwise available to the Carrier, as if such provisions were

Lloyd's defenses to its "Sub–Contractors." The bill of lading defined "Sub–Contractor" to include "owners and operators of vessels (other than the Carrier), stevedores, terminal and groupage operators ... and any independent contractor employed by the Carrier in performance of the Carriage."

The plain language of Hapag–Lloyd's bill of lading therefore extends COGSA to the period while the cargo is in the carrier's custody (through its agent, the stevedore) after discharge. The Himalaya clause also extends all the benefits available to Hapag–Lloyd to Maher, as a sub-contractor, including the $500 liability limitation. Various courts have upheld the use of a Himalaya clause in a bill of lading to limit the liability of stevedores, terminal operators, and other independent contractors during the period between discharge and delivery. *Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.*, 896 *F.*2d 656, 659–60 (1 st Cir.1990); *DeLaval Turbine Inc., v. West India Industries, Inc.*, 502 *F.2d* 259, 264 (3d Cir.1974); *Barber Blue, supra.*

Some courts require that the party seeking COGSA's refuge be expressly enumerated in the Himalaya clause. *DeLaval Turbine, supra; Cabot Corp. v. S.S. Mormacscan*, 441 *F.*2d 476 (2d Cir. 1971). These courts relied on *Herd & Co. v. Krawill Machinery Corp.*, 359 *U.S.* 297, 305, 79 *S.Ct.* 766, 771, 3 *L.Ed.*2d 820, 825 (1959), that held that such clauses be strictly construed against the party seeking protection. In *Herd*, the Court refused to imply an extension of COGSA to limit the liability of a negligent stevedore when the bill of lading contained no indication that the contracting parties had intended to limit liability of stevedores or other agents of carrier for damage caused by their negligence. The clear import of *Herd* was that a Himalaya clause is enforceable when a bill of lading demonstrates a clear intent to extend benefits to the party seeking protection. Marva Jo Wyatt, *Contract Terms in*

---

expressly for his benefit; and in entering into this contract, the Carrier, to the extent of these provisions, does so not only on his own behalf but also as agent and trustee for such Persons.

*Intermodal Transport: COGSA Comes Ashore*, 16 *Tul. Mar. L.J.*
177, 179–180 (1991). Thus, COGSA benefits may extend to parties
who are unnamed in the bill of lading. *Barretto Peat, supra*, 896
*F.*2d at 660; *Barber Blue, supra*, 675 *F.*2d at 270. The terms
must simply be expressed to a "well-defined class of readily
identifiable persons," for the benefits to be extended. *Barretto
Peat, supra*, 896 *F.*2d at 660. (quoting *Barber Blue, supra*, 675
*F.*2d at 270). "When a bill refers to a class of persons such as
'agents' and 'independent contractors' it is clear that the contract
includes all those persons engaged by the carrier to perform the
functions and duties of the carrier within the scope of the carriage
contract." *Barber Blue, supra*, 675 *F.*2d at 270.

In this case, the Himalaya clause specifies that all sub-contrac-
tors of the carrier shall have the carrier's benefits and defenses
available to it. Maher, the marine terminal operator, is unequivo-
cally a "sub-contractor" of Hapag–Lloyd. Both "stevedores" and
"terminal operators" are expressly named in the bill of lading's
definition of "Sub–Contractors." Therefore, we are convinced that
the parties contemplated in the bill of lading that Hapag–Lloyd's
agents would be covered by COGSA's benefit of the $500 liability
limitation.

## C. Under the Terms of this Bill of Lading, When Does the Limitation on Liability of the Marine Terminal Operator End?

Plaintiff argues that the Himalaya clause cannot protect Maher
because the bill of lading no longer governed at the time the cargo
was damaged because proper delivery of the goods had already
occurred. Plaintiff claims that the provision on the front of the
bill of lading indicating that the place of delivery is "New York,
N.Y. Alongside" means that the bill of lading terminated upon
discharge and delivery of the goods on the pier. Alternatively,
plaintiff asserts that for purposes of the Harter Act, proper
delivery occurred when the cargo reached a safe and suitable
wharf, specifically when the machinery was delivered to defen-
dant's storage yard.

Although COGSA applies from the time the goods are loaded on to the ship until the time of discharge, the Harter Act, 46 *U.S.C.App.* §§ 190 to –95, covers the period when the carrier or its agent accepts custody of the goods before loading, and the period between discharge of the goods from the ship until proper delivery. *Tapco Nigeria, supra,* 702 *F.*2d at 1255. Although COGSA provides that the parties can enter into a special agreement extending COGSA's benefits to the period before loading and after discharge of the goods, 46 *U.S.C.App.* § 1307, any special agreement is governed by the Harter Act, which voids any provision in the bill of lading *relieving the carrier* "from liability for loss or damage arising from negligence, fault or failure on proper loading, stowage, custody care, or proper delivery of any and all lawful merchandise or property committed to its . . . charge." 46 *U.S.C.App.* § 190. The Harter Act also extends the period by which the bill of lading governs so that any third parties enjoying the protection of a Himalaya clause will continue to be protected until proper delivery. Once proper delivery occurs, the Harter Act ceases to apply and the carrier's responsibilities are those of a bailee or warehouseman. *Goya Foods Inc. v. S.S. Italica, S.S.,* 561 *F.Supp.* 1077, 1086 (S.D.N.Y.1983), *aff'd,* 742 *F.*2d 1434 (2d Cir.1983).

Therefore, the Harter Act requires that risk of loss remain with the carrier until "proper delivery" of the cargo. Although the Act itself does not define proper delivery, proper delivery has generally been held to require discharge of the cargo on "a fit and customary wharf." *Allstate Ins. Co., supra,* 646 *F.*2d at 168. Proper delivery may be either actual or constructive. Actual delivery is the transfer of full possession and control to the consignee or its agent. *B. Elliott, supra,* 704 *F.*2d at 1308. Constructive delivery means, generally, that the goods must be unloaded from the vessel onto a dock, wharf, pier or terminal, segregated by bill of lading, and put it in a secure and suitable place, accessible to the consignee. *Tapco Nigeria, supra,* 702 *F.*2d at 1255. The consignee must also be given proper notice and

a reasonable time to pick up the goods. *B. Elliott, supra,* 704 *F.*2d at 1308.

Plaintiff's argument that proper delivery is satisfied by merely unloading the goods from a ship onto a wharf or pier has been frequently rejected. *See United States Fire Ins. Co. v. S.S. MEE MAY,* 1990 *WL* 154696 (S.D.N.Y. Apr. 13, 1990) (holding that stevedore and marine terminal operator were protected for damage to plastic injection molding machine by a $500 liability limitation in the bill of lading because proper delivery had not yet occurred when cargo was damaged while being hauled on chassis from a stringpiece). Conversely, a carrier may not relieve itself of the responsibility to make proper delivery. *David Crystal, supra,* 339 *F.*2d at 297 (invalidating clauses in the bill of lading that indicated that the carrier's responsibility would cease when delivery was made from the ship's deck and that the carrier could abandon the goods if the consignee did not immediately retrieve them under the Harter Act).

Similarly, we do not construe "New York, N.Y. Alongside" as terminating the contract when the goods were discharged at the pier. Case law indicates that a contract for carriage does not expire until proper delivery is made, and the facts of this case support the conclusion that proper delivery did not occur immediately upon discharge of the goods onto defendant's stringpiece. The Law Division observed:

> The Court finds as a matter of fact from Stevedore's undisputed affidavit, from a review of the numerous cases involving cargo damage, and from common sense that Stevedore's stringpiece is not [a] fit and customary wharf. Reasonable minds cannot disagree that Stevedore's operations on the stringpiece are ordinarily too concentrated and massive to permit delivery there.

We agree. Port Elizabeth is far too active a port to allow a stringpiece to be considered a fit and customary wharf.

A more difficult question concerns whether Maher's storage yard constitutes a "fit and customary wharf" for purposes of proper delivery under the Harter Act, or did proper delivery contemplate that the goods be made accessible for further inland transport. We are convinced by the reasoning of several courts

that proper delivery has not occurred even though a consignee had notice of the cargo's arrival and the cargo had been discharged onto a fit and proper pier and later placed in storage. *See Koppers Co., supra,* (holding that delivery was not satisfied when goods were damaged while being hauled out of the container yard on a chassis to a shed to be prepared for delivery to a trucker and that bill of lading with its COGSA liability limitation was still in effect); *B. Elliott, supra,* (holding that delivery had not occurred when cargo was damaged prior to removal of the goods from the container and placement on the shipper's truck).

■■■ Simply put, we believe that stripping cargo from a mafi occurs before proper delivery under the Harter Act. *See Wemhoener Pressen, supra,* 5 *F.*3d at 742 (finding that proper delivery of goods had not occurred because cargo was damaged while being stripped from a mafi and not "at the disposal" of the consignee or ready to be received by the inland carrier); *Jagenberg, supra,* 882 *F.Supp.* at 1077 (holding that proper delivery of goods stored at stevedore's yard for five days would have occurred when the goods were loaded onto vehicles of an inland trucker, whether hired by the shipper or the carrier). *Jagenberg* recognized that the stevedore has several duties to perform before the shipper's consignee can take custody of the goods. The court noted:

> Just as goods are not available to the inland carrier before the mafi is stripped by the terminal operator, nor are they available before they are physically moved out of storage by agents of the sea carrier and prepared for the trucker to be able to actually receive them. . . . Increasing efficiency and integration in cargo transport continues to blur the lines separating sea carriers responsibilities from those of others. The Court finds it advisable to keep sea carriers to the standards imposed by the Harter Act until goods are in the hands of land carriers and actually leaving the maritime area.

> [*Id.* at 1078.]

In this case, no delivery occurred because Maher had neither loaded the goods onto consignee's vehicles for inland transport nor finished preparing the goods for loading onto consignee's vehicles. Moreover, consignee had not taken physical control of the property when the goods were damaged.

Therefore, we agree with the courts below that delivery had not yet occurred when the goods were damaged. The bill of lading was still in effect, and the COGSA extensions and Himalaya clause applied at the time the damage occurred, thereby limiting the marine terminal's liability to $500 per package. We simply point out that if the shipper had valued the goods at $370,000, Maher would have been obligated to pay that sum if at fault. The freight charges would have been higher, but perhaps insurance premiums would have been lower. We also point out that if the shipper had valued the goods at $370,000, it would undoubtedly have sought to impose liability on the carrier, Hapag–Lloyd. We sense that these are rather sophisticated parties involved in the ocean carriage of goods and knew how to allocate the risks of commerce.

We affirm the judgment of the Appellate Division.

STEIN, J., dissenting.

The Court meticulously has described the relevant history of maritime law and the events that led to the enactment of the Harter Act, 46 *U.S.C.App.* §§ 190 to –96, and the Carriage of Goods by Sea Act (COGSA), 46 *U.S.C.App.* §§ 1300 to –15. The Court correctly notes that those federal laws should govern a liability dispute between a stevedore hired by an ocean carrier and a shipper of goods damaged by that stevedore before delivery occurs. The Court also concludes that COGSA's limitation on liability provision may be extended to the ocean carrier's subcontractors until delivery occurs. The Court accurately recapitulates the facts that detail the relationship between the parties, correctly concluding that COGSA's limitation on liability provision was extended by the parties to the period covered by the Harter Act.

I differ only with the majority's conclusion that "proper delivery" did not occur. The Harter Act applies to a stevedore responsible for unloading cargo if the unloading function is sufficiently related to the transport of the cargo to the place of delivery. Obviously, that statute does not intend that the steve-

dore retain COGSA's limited liability protection after unloading is completed and the goods are safely stored awaiting pickup by the consignee. On this record, it appears that unloading was completed and that the stevedore held the goods in its own storage area for six days. The record also indicates that notice that the goods were ready to be picked up had been given to the consignee.

The Court holds, however, that "proper delivery" of the goods had not occurred because the cargo remained on a mafi and therefore was not ready to be picked up by the consignee. Thus, the majority concludes that the applicability of the Harter Act and the limitation of liability provision of COGSA may turn on whether the cargo remains on a mafi. Based on that analysis the majority finds that the Harter Act and COGSA apply to plaintiff's claim and that defendant is liable only for $500 of the approximate $370,000 in damages caused by defendant's mishandling of the cargo. Because it is evident that the goods had been delivered in this case and that "stripping cargo from a mafi," *ante* at 212, 753 A.2d at 628, is not required to effectuate "proper delivery" under the Harter Act, I respectfully dissent.

I

Plaintiff is a subrogated underwriter suing in the name of its insured, M.C. Machinery Systems, Inc. (M.C.Machinery). Dia International Traffic Co., Ltd. (Dia International), a non-vessel owning common carrier, contracted with M.C. Machinery to transport a 42 kilogram plastic injection molding machine from Japan to Glendale Heights, Illinois. Hapag–Lloyd America, Inc. (Hapag–Lloyd), an ocean carrier, was hired by Dia International to transport the machine overseas from Japan to the Port of New York–New Jersey, located at Port Elizabeth, N.J., before it was to be picked up by plaintiff for transport by truck to Illinois.

On arrival of the cargo at Port Elizabeth, defendant Maher Terminals, Inc. (Maher) discharged the machine by crane from the ocean carrier to Maher's stringpiece, part of the pier that extended alongside the ship. The machine was then placed on Maher's

mafi and hauled from the stringpiece to a separate storage area. A mafi is a wheeled, non-motorized flatbed trailer on which cargo can be transported from one place to another on terminal premises. The cargo stayed in storage for six days on Maher's mafi until Maher apparently needed the mafi for other cargo. Maher's superintendent of the storage facility stated that "Maher lifted the cargo from the mafi and intended to ground the cargo at a place in the terminal so that consignee's trucker, who had not yet come, would have an opportunity to take delivery of the cargo." As one of Maher's crane operators was lifting the machine off the mafi, a cable slipped and the cargo fell to the ground. That event resulted in approximately $370,000 in damages to the machine.

Maher had a terminal operating and stevedoring contract with Hapag–Lloyd, pursuant to which it was to discharge cargo from Hapag–Lloyd's vessels and provide storage for the cargo until the consignee arrived to retrieve it. Maher damaged M.C. Machinery's cargo while removing the machine from its own mafi that was then needed for other cargo. Maher now seeks to limit its potential liability for mishandling the cargo to only $500, relying on its contract with Hapag–Lloyd and the limited liability provision afforded to ocean carriers under COGSA.

## II

The Harter Act was enacted in 1893 in response to the practices of ocean carriers that inserted release-from-negligence provisions into their bills of lading in an attempt to limit their liability as carriers of goods. *Pan American World Airways, Inc. v. California Stevedore & Ballast Co.*, 559 *F*.2d 1173, 1175 n. 1 (9th Cir.1977). Under the Harter Act, carriers could no longer relieve themselves "from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to ... their charge" by adding broad protective language into the carriage contract. 46 *U.S.C.App.* § 190. The Harter Act encompassed the vessel owner's entire period of

liability, beginning from the time when the carrier or its agent accepted custody of the goods before loading, through the unloading of the goods from the vessel, and continuing until delivery to a common carrier occurred. *Tapco Nigeria, Ltd. v. M/V Westwind,* 702 *F.*2d 1252, 1255 (5th Cir.1983). The Harter Act was successful in striking a balance between the dominant British merchant marine that sought to avoid responsibility for any claims based on negligent handling of cargo, and shippers that sought to hold ocean carriers liable for all damages resulting from negligence during transport of the goods. *Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.,* 603 *F.*2d 1327, 1333 (9th Cir.1979), *cert. denied,* 444 *U.S.* 1012, 100 *S.Ct.* 659, 62 *L.Ed.*2d 640 (1980).

The Harter Act was for the most part superseded by the Carriage of Goods by Sea Act (COGSA) that codified the Hague Rules in 1936. *Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 *F.*3d 734, 741 (4th Cir.1993). The purpose of the Harter Act, COGSA, and the Hague Rules was to achieve a "fair balancing of the interests" between ocean carriers and shippers, and also "to effectuate a standard and uniform set of provisions for ocean bills of lading." *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 *F.*2d 7, 11 (2nd Cir.1969). *See also* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 10–15 at 75 (2d ed.1994) (noting that COGSA's goal was "to achieve international uniformity and to redress the edge in bargaining power enjoyed by carriers over shipper and cargo interests by setting out certain duties and responsibilities of carriers that cannot be avoided even by express contractual provision"). To effectuate that balance COGSA limits liability for cargo damage to $500 if damage occurs between the time cargo is loaded onto the ship to the time it is discharged. 46 *U.S.C.App.* § 1304(5). That limitation does not apply, however, if the shipper declares the value of the cargo in the bill of lading. *Ibid.* In contrast, the Harter Act contains no provision limiting the carrier's responsibility for negligence to a specific dollar amount. 46 *U.S.C.App.* §§ 190 to –96. Further, COGSA defers to the Harter Act in dealing with questions of liability that pertain to post-discharge negligence:

> Nothing in this chapter shall be construed as superseding any part of sections 190 to 196 of this title, or of any other law which would be applicable in the absence of this chapter, *insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship.*
>
> [46 *U.S.C.App.* § 1311 (emphasis added).]

Notwithstanding those provisions, COGSA allows an ocean carrier and shipper to enter into a special agreement concerning "responsibility and liability" that extends the coverage of COGSA to the periods before loading and after discharge of the goods. 46 *U.S.C.App.* § 1307. In the absence of such an agreement, the Harter Act applies to damage that occurred prior to loading or after discharge of cargo until proper delivery is made because those periods are not covered by COGSA. *Wemhoener Pressen, supra,* 5 *F.*3d at 739; *Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro,* 775 *F.*2d 476, 482 (2nd Cir.1985), *cert. denied,* 475 *U.S.* 1099, 106 *S.Ct.* 1502, 89 *L.Ed.*2d 903 (1986).

Neither the Harter Act nor COGSA apply after "proper delivery" of the goods by the carrier is effectuated. *Wemhoener Pressen, supra,* 5 *F.*3d at 741; *B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 *F.*2d 1305, 1307 (4th Cir.1983). Although "proper delivery" is not defined in the Harter Act, that term has been interpreted to include both actual and constructive delivery:

> *Actual delivery consists [of] completely transferring the possession and control of goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods to put them under proper care and custody.* Upon 'proper delivery' the Harter Act ceases to govern the relationship between the parties, and a sea carrier's strict liability, as such, terminates. Thereafter, the carrier's responsibilities are those of a bailee or warehouseman to take ordinary care of the property and not to abandon it or negligently expose it to injury.
>
> [*Orient Overseas Line v. Globemaster Baltimore, Inc.,* 33 *Md.App.* 372, 365 *A.*2d 325, 335 (1976) (citations omitted) (emphasis added).]

That interpretation has been adopted in cases that considered whether delivery had occurred prior to the occurrence of damage. *Jagenberg, Inc. v. Georgia Ports Auth.,* 882 *F.Supp.* 1065, 1076–77 (S.D.Ga.1995); *Wemhoener Pressen, supra,* 5 *F.*3d at 741–42; *B.*

*Elliott, supra,* 704 *F.*2d at 1308. *See also Tapco Nigeria, supra,* 702 *F.*2d at 1255 (noting that proper delivery requires discharge of cargo "upon a fit and customary wharf"); *Allstate Ins. Co. v. Imparca Lines,* 646 *F.*2d 166, 168 (5th Cir.1981) (same); *Union Steel America Co. v. M/V Sanko Spruce,* 14 *F.Supp.*2d 682, 694 (D.N.J.1998) (holding that Harter Act "imposes a duty on carriers to deliver the goods from wharf to wharf, to notify the consignee of the vessel's arrival, and to protect the cargo until the consignee has a reasonable opportunity to remove it"); *Morse Electro Products Corp. v. S.S. Great Peace,* 437 *F.Supp.* 474, 486 (D.N.J.1977) (defining proper delivery "as the discharge of . . . cargo to a fit and proper pier").

Courts also have distinguished the liability of a carrier from the liability of a warehouser of delivered cargo. In *Goya Foods, Inc. v. S.S. Italica,* 561 *F.Supp.* 1077, 1086 (S.D.N.Y.1983), a federal district court held that

proper delivery thus ends '(t)he liability of the carrier as carrier,' [but] it does not negate the carrier's responsibility safely to store the cargo until the consignee comes to remove it. *Instead, a 'carrier in possession of goods not yet called for is liable as a bailee for negligence in the storage of the goods,' and must answer for damage caused by its own negligence or that of a stevedore acting as its agent.*

[Citations omitted (emphasis added).]

That court has held that a carrier that merely offloads cargo does not satisfy the requirements of "proper delivery" and that "[i]n order to satisfy [a carrier's] obligations under the Harter Act, the carrier must, at least, place the goods in a secure and suitably sheltered place accessible to the consignee, giving the consignee notice and a reasonable opportunity to pick up the goods." *United States Fire Insurance Co. v. S.S. MEE MAY,* 1990 *WL* 154696 at *3 (S.D.N.Y.1990).

### III

The correctness of the majority's conclusion that COGSA and the Harter Act would govern Maher's liability if the goods had been damaged during discharge but before delivery is not disputed. Maher was a sub-contractor as defined in Hapag–Lloyd's bill

of lading, and the bill of lading extended COGSA so that its provisions applied "while the Goods are in the custody of the Carrier or his Sub-contractor at the sea-terminal in the United States of America before loading onto the Vessel or after discharge therefrom as the case may be." However, once proper delivery occurs applicability of the Harter Act and COGSA ceases and the stevedore then becomes responsible for the goods under the law of bailments. *Goya Foods, supra,* 561 *F.Supp.* at 1086.

Several cases have absolved carriers from liability after proper delivery has occurred on the basis that the Harter Act no longer applies to the shipment. *Hillcrest Sales, Inc. v. Chilean Line, Inc.,* 1998 *WL* 961894, *5 (E.D.Pa.1998) (finding that cargo was properly delivered when carrier "placed [goods] in the sheds pursuant to normal practice at the port to await ... pick-up by plaintiff's contractors and/or agents"); *J. Kinderman & Sons v. Nippon Yusen Kaisha Lines,* 322 *F.Supp.* 939, 941–42 (E.D.Pa. 1971) (concluding that proper delivery occurred with discharge to a fit and customary wharf, reasonable notice given to the consignee, and fair opportunity for removal of goods from the pier). The majority relies on two Fourth Circuit cases to conclude "that proper delivery has not occurred even though a consignee had notice of the cargo's arrival and the cargo had been discharged onto a fit and proper pier and later placed in storage." *Ante* at 212, 753 *A.*2d at 627. However, in those cases the carrier was required to perform additional duties beyond discharging the cargo properly. *Koppers Co., Inc. v. S/S Defiance,* 704 *F.*2d 1309, 1312 (4th Cir.1983) (noting that "bill of lading required [carrier] to load the cargo on one or more trucks for delivery"); *B. Elliott, supra,* 704 *F.*2d at 1308 (finding that carrier's stevedore was obligated "to have the cargo removed from the container and placed in or on the overland truck").

The majority's conclusion that proper delivery under the Harter Act had not occurred until the cargo was stripped from the mafi and prepared for pickup is unpersuasive. Surely a stevedore cannot avoid liability as a bailee simply by refusing to remove

goods from a mafi, irrespective of the period of retention. The record reveals that the cargo had been held on a mafi owned by Maher for six days. If that period had been six weeks, the Court would be hard pressed to conclude that proper delivery had not occurred. In my view, retention of the goods on a mafi, while relevant, should not determine time of delivery. The more relevant inquiry is whether, as a practical matter, the unloading process has been completed and the cargo has been placed by the stevedore in storage on a fit pier. That standard clearly has been satisfied·here.

The majority correctly notes that M.C. Machinery had not assumed actual physical control of the goods when they were damaged. *Ante* at 213, 753 *A*.2d at 628. However, assumption of physical control of the machinery by the consignee is not required in determining whether proper delivery had occurred. *Orient Overseas Line, supra,* 365 *A*.2d at 335 (stating that proper delivery includes both actual or constructive delivery); *Morse, supra,* 437 *F.Supp.* at 486. The Harter Act, whose original purpose was to protect shippers of cargo, should not be construed to apply indefinitely after cargo has been delivered but has not been picked up by the consignee or its agent. *Morse, supra,* 437 *F.Supp.* at 487 (finding that "[n]o term of the bill of lading extends the application of the Harter Act beyond its statutory reach"). The Court's result is incongruent with the purpose of the Harter Act and of COGSA, and extends the definition of "proper delivery" unnecessarily beyond the intended scope of those statutes.

Proper delivery occurred in this case. Port Elizabeth is without question a "fit and customary wharf" for purposes of proper delivery under the Harter Act. Pursuant to its contract with Hapag–Lloyd, Maher unloaded the cargo from the ocean carrier on its own stringpiece without incident. Maher then placed the machine on one of its own mafis to transport it to its storage area. The machine remained in storage for almost a full week and was available for pickup by the consignee. Hapag–Lloyd's own "Arriv-

al Notice" that was issued to M.C. Machinery stated that the cargo would be available for pickup on the date of discharge, and further provided:

ALL CARGO WHEN DISCHARGED ON WHARF IS AT OWNER'S RISK AND, IF NOT REMOVED WITHIN THE FREE TIME, BECOMES SUBJECT TO DEMURRAGE CHARGES

Therefore, the cargo had been removed safely from the ocean carrier, moved to a storage facility without incident, and proper notice had been given of the cargo's arrival and availability for pickup. Proper delivery, as contemplated by the Harter Act, clearly had occurred because the ocean carrier had fulfilled its obligations to discharge the cargo to a suitable place accessible to the consignee, and to give the consignee notice and a reasonable opportunity to pick up the cargo.

## IV

Because I believe proper delivery had occurred where the cargo had been discharged onto a fit and proper pier, notice was properly given to the consignee, and the cargo was made available for pickup for six days after discharge from the vessel, I conclude that the Harter Act and COGSA's $500 liability limitation are inapplicable to this matter. I would reverse and remand the case to the Law Division for trial to determine the amount of damages defendant is liable for as bailee of the cargo.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, COLEMAN and VERNIERO—5.

*For reversal and remandment*—Justices STEIN and LONG—2.